**Affirmed and Opinion filed December 4, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00509-CV

## IN THE INTEREST OF C.F., JR.; K.F.; AND C.F., CHILDREN

**On Appeal from the 328th District Court**
**Fort Bend County, Texas**
**Trial Court Cause No. 16-DCV-237456**

## O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. *See* Tex. Fam. Code Ann. § 109.002(a-1) (West 2014 & Supp. 2018). The children are twins Chris and Kevin and their younger brother, Charlie.[1] The appellant is R.M. (Mother). The boys' father was incarcerated through the pendency of this case and is not a party on appeal. The appellees are the Texas Department of Family and Protective Services (the Department) and the boys' aunt, F.M. (Aunt). After the Department abandoned its

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

request to terminate Mother's parental rights, the trial court appointed Aunt as the boys' sole managing conservator. Mother was named a possessory conservator.

On appeal, Mother contends the trial court violated her right to counsel by allowing her appointed lawyer to withdraw one day before trial, then abused its discretion in denying her motion for continuance of the trial. Next, she challenges the sufficiency of the evidence supporting termination, which we liberally construe as a challenge to Aunt's appointment as managing conservator. We conclude Mother has not shown the trial court abused its discretion in granting the motion to withdraw or in denying the continuance. We further conclude the trial court did not abuse its discretion in appointing Aunt as the boys' managing conservator. Therefore, we affirm the trial court's judgment.

## BACKGROUND

### A.    Removal

Mother has eight children: three sons and five daughters. Her three sons are the subject of this appeal. Chris and Kevin had just turned 13 and Charlie was 10 when this case began. The boys share one father (Father), and the girls share another. The girls' father was the boys' de facto stepfather, and we refer to him as Stepfather in this opinion.

In September 2016, the Department received a referral alleging negligent supervision by Mother of all eight children. She and the children had been living for eight months in a local women's shelter, which was designed to provide three months of temporary housing. She reportedly left the property for hours at a time, leaving the children alone during her absence. The person who initiated the referral also said Mother was not feeding the children on the weekend, which led to some of the children to hoard food during the week. Two weeks later, the Department received another referral alleging Mother left six of the eight children alone in her

2

van in the shelter's parking lot. The family had been ejected from the shelter. The Department ruled it was unable to determine the allegations and referred the case to Family Based Safety Services (FBSS).

The family moved into and were ejected from multiple shelters over the next two months due to violating the shelters' rules. Chris and Kevin reportedly vandalized property at one shelter and trespassed at their school. Mother behaved erratically, sometimes going out in public wearing only a towel.

After many attempts to help the family, the Department determined Mother could not provide the children with a safe and suitable home, nor could any of the relatives she identified as possible placements. The Department removed the children on December 1, 2016. The next day, the Department filed its original petition for protection of a child, for conservatorship, and for termination of parental rights. The trial court signed an order of protection in an emergency naming the Department as the children's temporary managing conservator.

## B.  Appointment and withdrawal of counsel

The trial court appointed Kathy Johnson as Mother's attorney ad litem on December 2, 2016, the day suit was filed. Johnson filed a general denial on Mother's behalf.

The case was pending for seventeen months before trial. During that time, the trial court typically held monthly hearings, some required by the Family Code and others that the judge described as "informational hearings." The record reflects Johnson or her delegate appeared at every hearing relevant to Mother. Mother appeared personally at a handful of those hearings.

On April 24, 2018, one week before trial, Johnson filed a motion to withdraw as Mother's counsel. The motion stated in relevant part:

> Good cause exists for withdrawal of Kathy L. Johnson as counsel, in that she is unable to effectively represent [Mother] as [Mother] has sought other counsel and does not want current counsel to represent her on her case anymore.
>
> A copy of this motion has been delivered to [Mother]. [Mother] is hereby notified in writing of her right to object to this motion. [Mother] has NOT consented to the motion as time is of the essence in filing this motion due to trial being set for May 1, 2018.

The record does not contain a written response by Mother to the motion to withdraw.

The trial court held a hearing on Johnson's motion to withdraw on April 30, 2018, the day before trial. Mother appeared at the hearing. Johnson explained that on the evening of April 23, 2018, Mother sent Johnson an email or text message indicating another lawyer would join Johnson in representing Mother and would call Johnson in the morning. Johnson retrieved the message the morning of April 24, 2018. She tried to get in touch with the lawyer but was not successful until April 25, 2018, when the lawyer contacted her and said she would not represent Mother. Johnson said this was the second time in the last month Mother had said she was getting a new lawyer. The first time, Johnson said, the supposed new lawyer also contacted her and said he would not represent Mother. Counsel for the Department offered more information about the first lawyer, explaining he had called her and appeared to be under the impression Mother had been proceeding pro se. The Department's lawyer had referred him to Johnson.

Johnson told the court:

> [T]here is a lack of trust between my client and with me. There is a lack of communication between the two of you [sic]. I have [not] been able to do anything since last month to prepare for trial because I'm in a limbo of whether an attorney takes over or not. I have been told by a client that they want another attorney on board. So, I'm of the position of not being able to prepare for a trial and I don't think that I have communication or trust with my client anymore to be able to go forward

4

on this. Has nothing to do with the time frame or trying to delay trial. That's not my purpose. . . . [I]f we go forward and I'm not relieved on this case, it's going to be ineffective assistance of counsel on appeal because there is not trust.

At the trial court's instruction, Mother was sworn in. She and the trial court had the following exchange:

The Court: Okay. Do you have a lawyer?

Mother: It was a potential lawyer I'm going to hire.

The Court: You had a couple of potential lawyers?

Mother: Yes, sir.

The Court: Were you aware they contacted Ms. Johnson to let her know that they were I guess coming on or were going to come on? Did you know that?

Mother: I have. Yes, I did.

. . .

The Court: You having a problem with Ms. Johnson?

Mother: No. She is wonderful. She's great.

The Court: You just wanted to get another lawyer you thought?

Mother: Right.

The Court: Any questions, Ms. Johnson, for mom here?

Johnson: No questions, Judge. I have forwarded her everything including the redacted files previously but I have a thumb drive with everything I have on my files that I can hand her today, [too]. I wish her the best. I wished I could help her but there['s] not a communication between the two of us and I have nothing else.

The trial court orally granted Johnson's motion to withdraw and cautioned

Mother that trial would begin the following day:

> [Mother], I expect you to be here tomorrow and if you don't have counsel, then, you'll be pro se. I'm not saying that you purposely decided to have problems or there were problems ongoing for the past month or two but we've got a deadline and the deadline is the end of May. So, we're going to trial tomorrow with or without counsel from your perspective. . . .

## C. Trial

As the trial judge promised, trial was held the next day. Before testimony began, the trial court questioned Mother about whether she engaged a lawyer:

The Court: And mom is here pro se. Did you get ahold of one of these lawyers.

Mother: No, Your Honor. I want this case to go into continuance because I need time to get counsel and if you can provide me with one.

The Court: Yeah. Well, I had one provided for you and you chose to get rid of her.

Mother: I didn't get rid of her. She quit.

The Court: Excuse me, I'm talking right now. We're not going to delay this case so that you can figure that you're going to get some advantage. I gave you ever[y] opportunity. . . . [Y]ou haven't worked with Ms. Johnson according to the testimony yesterday and you've talked to at least two lawyers and neither one of them are here this morning. So, you're going to be here pro se.

The following witnesses testified: (1) Debbie Harris, the boys' counselor/therapist; (2) Kristy Gutierrez, who conducted a forensic interview of the boys concerning their outcry of physical abuse by Stepfather; (3) Daphne McCadney, the Department conservatorship supervisor for the boys; (4) Dorothy Milligan, the boys' Court Appointed Special Advocate (CASA); (5) Aunt;

6

(6) Mother's sister, Teresa; and (7) Mother's mother, Victoria. Mother did not testify, and she called only Teresa and Victoria as witnesses.

The Department offered letters from each of the boys into evidence; the trial court admitted them over Mother's objection that the letters were not written in her sons' handwriting. Also admitted without objection was a DVD recording of the forensic interview, photos from Aunt, print-outs of text messages between Mother and Aunt, and the boys' school records. Mother did not offer any exhibits.

### 1. Physical abuse by Stepfather, inappropriate sexual behavior by Mother

Gutierrez interviewed each boy separately about physical abuse by Stepfather and sexually inappropriate conduct by Mother. The interviews were conducted more than a year after this case began but concerned pre-removal events. All three boys confirmed the abuse and misconduct. Gutierrez testified about each boy's disclosure as follows:

***Chris's statements about Stepfather.*** Stepfather picked Chris up and threw him down on the floor. Stepfather beat Chris with a stick. Stepfather caused Chris's head to hit the wall at least twice. Stepfather whipped Chris with a belt "pretty much everywhere," including his face and stomach. Stepfather kicked Chris in the face. After one of Mother's children disclosed to a teacher that the children were not showering regularly, Stepfather kicked Chris in the stomach, stepped on his face, and slapped him at least twice. Stepfather suffocated Chris by holding his head against a pillow, preventing him from breathing. Stepfather threw a basketball at Chris's stomach. Once, Stepfather picked Chris up by the neck and slammed Chris's head against the wall so hard that Chris "saw God." Mother was in the room and did not try to stop the abuse. Chris lost consciousness. He woke up in a closet. Stepfather once whipped Chris while Chris was naked. Stepfather abused only the boys; Chris

7

never saw him abuse the girls, Stepfather's biological children.

***Kevin's statements about Stepfather.*** Kevin said Stepfather was "cool at first," then began beating him and his brothers. From sometime in 2015 through the middle of 2016, Stepfather beat Kevin and punched Kevin's chest and stomach. Mother was in the room during the abuse. Stepfather "whipped" Kevin's eye so badly that it bled and Kevin had to go to the hospital. Stepfather told Kevin to lie and say he fell off his bike. Stepfather choked Kevin into unconsciousness. Like Chris, Kevin regained consciousness in a closet. Stepfather threw Kevin around and put his head through a wall. When Mother learned of any misbehavior by the boys at school, she instructed Stepfather to whip them.

***Charlie's statements about Stepfather.*** Charlie talked "a little" about abuse by Stepfather. He said Stepfather hit him and his brothers when Mother was gone. Stepfather punched him in the chest "and stuff." Charlie used to think Stepfather was roughhousing, but at the time of the interview, he believed Stepfather's behavior was not "funny" or "cool." Charlie seemed to believe Mother knew about the abuse.

***The boys' statements about Mother.*** While living in a shelter, Mother asked Charlie to shave her pubic hair. He did so "because [he] didn't know any better." Mother was lying down, naked, and talking on her phone while he shaved her. The incident lasted about ten seconds. Chris and Kevin both heard Mother ask Charlie to shave her. Charlie was uncomfortable describing the event to Gutierrez. All three boys said Mother used to walk around naked.

### 2. Removal and the months following

In the weeks before removal, Chris and Kevin allegedly broke into their school to take a shower. None of Mother's eight children was being adequately fed, and the three boys hoarded food to share with their younger sisters.

The older boys behaved poorly and sometimes criminally. They reportedly vandalized the inside of a church while temporarily living in the church's homeless shelter. At least one of the boys allegedly urinated on and smeared feces on the wall of another shelter. The older boys were academically behind in school, and none of them attended school regularly. The boys' behavioral and academic problems continued for several months after removal. Chris and Kevin reportedly stole articles of clothing from their foster homes.

### 3. Life with Aunt

All three boys were placed with Aunt about six months after removal, and they lived with her and her partner through the time of trial. By all accounts, the boys flourished and thrived in Aunt's care. They attended school regularly. Charlie's stated goal was to earn a place on the honor roll. Chris and Kevin both improved academically and were being tutored in any subjects with which they struggled. Each boy participated in several extracurricular activities, including football, basketball, track, and theater. The boys were looking forward to playing soccer during their summer vacation. The school reported no discipline or conduct problems for any of the boys.

Aunt attends to the boys' health and medical needs. Charlie suffers from a gastrointestinal disease called short bowel syndrome. At the time of removal, he had not seen a doctor for that disease in more than three years. His condition is treated and well managed under Aunt's care. He also has asthma that is controlled with treatment. Chris and Kevin were prescribed eyeglasses after being placed with Aunt.

The boys have plenty of room at Aunt's house. Chris and Kevin share a room; Charlie sleeps in a separate room. Aunt was approved as a foster parent, so the boys are eligible to receive funding through the foster program.

Aunt said the boys have very good character. McCadney described the boys'

gratitude, saying, "They appreciate all things. They're very mannerable and engaging and any little thing you do for them, they just appreciate that."

### 4. The boys' desires

Chris and Kevin were 14 and Charlie was almost 12 at the time of trial. Harris had been their therapist for about 10 months. During that period, she saw their self-esteem improve greatly. She also noted the strong bond between the boys and Aunt and other paternal relatives, family members with whom they did have a relationship before being placed with Aunt.

Along with their progress, though, the boys experienced a significant amount of stress about their visits with Mother, as well as their internal conflict as to whether they wanted to live with Aunt or Mother. The boys' emotions fluctuated after visiting Mother, according to Harris, from anger to sadness to happiness to anxiety.

Chris and Kevin told both Harris and Aunt that they feared Stepfather. Aunt testified their fear was the reason they wanted to stop visiting Mother. At Harris' request, each boy wrote a letter to Mother during an individual therapy session expressing his desires. The boys were separated when they wrote the letters so that each boy's thoughts would be independent. The letters are reprinted here:

> ***Chris's letter.*** "Hello Mom this is [Chris], I wrote this letter to tell you how I feel and what I wanted to do. I wanna stay here because I feel that this is a safe place for me. Im making good grades and, I am doing good in all my classes. I haven't got in trouble and [illegible]. They are treating me very well. They aren't bad people. They are just taking all the pressure off of you. I like staying here going to a good school and I would like to continue that. I have a lot of friends and I am experiencing new things that I have never done before. I just wanted to tell you that I would feel more comfortable if I stayed here and I would be more safe. Sincerely, [Chris]. P.S. I want the visits [illegible] the case because I feel uncomfortable and I don't like when you tell me what you want to do and what [illegible] not to do."

***Kevin's letter.*** "I wanna stay at my aunt's house because there are alot of opportunities for me over here. I want to see my mom after the CPS case is over so there won't be confusion. I want my sisters to be taken care of. [Kevin]"

***Charlie's letter.*** "Why I Wanna Stay Here. Dear Mom, I don't want go home because, I wanna be in more comfortable place don't get me wrong mom I still love you I will always love you for sure. I also don't want to go home because I wanna be with my other side of the family so hopefully you and [Aunt] or you and [Aunt's partner] can working something out so I can come see you. I love you mom and I hope you are ok. Love, [Charlie]"

When asked if the boys were "still torn about what they wanted," Harris addressed Mother from the witness stand, saying:

In looking at their mom, ma'am, I want to say they are torn over this because they really love you. I want you to know that, okay. Your kids love you. Okay. And I want you to know that. All right. So, when they wrote the letter, they were torn but they were looking at their future needs and they wanted to make sure they put those needs before their desires that was in their heart. So, they had to make a decision based on what they had been through and based on the things that they have gone through with their aunt which was absolutely different from what they had gone through when they were with their mom, is what they stated in the session. So, they wanted a life that would give them more stability.

Milligan served as the boys' CASA for about a year before trial. She felt she shared a rapport with them. She testified Chris has "always been adamant about staying with [Aunt]." Kevin and Charlie initially told her they wanted to return to Mother, and that was their position until three weeks before trial. At that time, though, they both decided they wanted to stay with Aunt. All three boys said they did not want to return to Mother if Stepfather would be present as well.

McCadney, the Department supervisor, echoed Harris's and Milligan's recounting of the boys' desires. She said the boys were "very vocal" about wanting

11

to stay with Aunt, something McCadney described as "rare":

> One of the things that I mentioned earlier was how the boys felt it was important for the agency to know their desires and having conversations with them on at least two or three occasions. Never inquiring about this, because I don't ask children where you want to live and things like that because we're going to make decisions about their care based off of the information that we receive but they were very vocal, have been vocal to anyone that asks. They want to stay where they are and that's rare and in my 21 years, we've probably had a handful of cases where children have been so definitive and it's because they're directly related to how safe they're going to feel and what they feel about their well being. They make it real clear. . . .

### 5.    Plans for the future

McCadney testified Stepfather was one of the "barriers" to the boys' return to Mother. She described them as "very terrified" of him. A few weeks before trial, the boys, through their attorney ad litem, applied for and obtained a protective order against Stepfather.[2] When asked if the protective order might alleviate the Department's concern about Stepfather, McCadney expressed doubt:

> From reviewing the history of this case, [Stepfather] does not stay away

---

[2] The protective order does not appear in the appellate record, but the trial judge described it on the record:
> . . . [F]or purposes of the record, about a week, ten days ago, something like that, we had a hearing on a protective order with the three boys being the individuals that were seeking a protective order. They were the applicants by . . . their attorney ad litem and a protective order was granted against [Stepfather]. [Stepfather] could not be around the boys -- well, at all, but particularly at mom's house; and, anyway, that protective order is a different case number but a certified copy of that order, I ordered to be filed in both this case involving the . . . boys, as well as the case involving the . . . girls . . . .

Further, the judgment states in relevant part:
> The children the subject of this suit have a protective order against [Stepfather] in Cause No. 18-DCV-250361. Therefore, IT IS ORDERED that the terms and provisions of the protective order will control the periods of possession and access to the children by both [Mother] and [Father]. Therefore, [Aunt], [Mother] and [Father] shall ensure that [Stepfather] shall not be within 200-yards of the boys or otherwise violate the terms and conditions of the protective order.

from [Mother] very long. [Stepfather] has a pretty significant criminal history. I don't know if a protective order could keep [Stepfather] away from [the girls]. That's his family. So, it's great in theory but I don't know if it would be enforced.

Harris believed the boys' best interests would be served by living with Aunt and having no further contact with Stepfather. Milligan believed making Aunt the boys' permanent managing conservator was in their best interest.

Aunt testified she and her partner are prepared to protect the boys from Stepfather. Aunt believes it is important for the boys to maintain a relationship with Mother. She intends to work with Mother to foster that relationship. She noted she has always been the one to reach out to Mother about visitation; Mother has not initiated contact.

### 6.    Evidence about Mother

*Department history.* The Department found reason to believe Mother exhibited inappropriate discipline in March 2010 by striking twins Chris and Kevin, then six years old, with a broom handle. She caused injuries to vital (face) and non-vital (arm) areas of both boys' bodies. Charlie was not hurt but was at risk. Six months later, one of the twins was observed with a "minor injury to a vital body area" and made an outcry that Mother had punched him in the face on numerous occasions. The Department was unable to determine the validity of those allegations. Several more referrals were made over the next six years alleging physical abuse and negligent supervision by Mother; the Department ruled them all out.

*Criminal history.* The record reflects Mother has no criminal history except for two traffic offenses, both in 2010.

*Testimony from Mother's sister.* Teresa testified Mother is "a great mother" who has never abused her children and never let anyone harm her children. However,

13

she testified she did not know about the two Department investigations in 2010 nor any of the 2016 events leading to removal. She believed Mother deserves to have the boys returned to her care. Teresa described Stepfather as "a good guy" who "stands up for himself" and "talk[s] for himself." She said she did not know Stepfather's extensive criminal history, including deferred adjudications or convictions for driving while intoxicated, possession of controlled substances, and at least five assaults causing bodily injury. Teresa did not believe Stepfather abused the boys; instead she believed the boys were coached to say he did.

**Testimony from Mother's mother.** Victoria supported the return of the boys to Mother. She said Mother does not drink or smoke, is not violent, is employed and can provide for her children, and teaches them well.

### 7. Trial court's findings

After closing arguments, the trial judge announced he would take the matter under advisement and would review his notes, the case file, and "the reports that have been done over the past year and a half . . . ." The judgment was signed three weeks later. It recites the court's findings that it is in the boys' best interest for Aunt to be their sole managing conservator and for Mother to be a possessory conservator. The judgment also states:

> Stepfather "has a history or pattern of committing family violence during the two-year period preceding the filing of this suit or during the pendency of this suit," and Stepfather "would endanger the children's physical health or emotional welfare." The children of this suit have a protective order against [Stepfather] in Cause No. 18-DCV-250361.

The judgment discontinues the Department's managing conservatorship of the boys, appoints Aunt as the non-parent sole managing conservator, and appoints Mother and Father as possessory conservators of the boys.

At the hearing on entry of judgment, the trial court emphasized the risk Mother

14

ran of allowing Stepfather to have contact with the boys in the future:

> [Mother], . . . I want to make sure that we understand one another. . . .
> [Y]our boys are not fans of [Stepfather] nor am I and I want you to
> understand that if [Stepfather] comes back in your life, you're going to
> be responsible for keeping these boys away from [Stepfather] and if
> you don't do that, you're not going to go to jail. [Stepfather] can go to
> jail over it but you could lose contact with your boys if [Stepfather] is
> around these boys. I just, I mean, that's the down side of [Stepfather]
> being part of your life, even though he's the parent of your five
> daughters . . . .

Mother timely appealed.

## ANALYSIS

### I.    Counsel and Continuance

In her first issue, Mother contends the trial court violated her right to counsel when it granted her appointed lawyer's motion to withdraw. Then, she asserts, the trial court abused its discretion in denying her motion for a continuance of trial. We review both decisions for an abuse of discretion. *In re Marriage of Harrison*, 557 S.W.3d 99, 112 (Tex. App.—Houston [14th Dist.] 2018, no pet. h.). We may not overrule the decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding principles. *Id.*

#### A.    Counsel

In termination suits filed by a governmental entity, the trial court "shall appoint an attorney ad litem to represent the interests of: (1) an indigent parent of the child who responds in opposition to the termination . . . ." Tex. Fam. Code Ann. § 107.013(a)(1). *See also In re B.G.*, 317 S.W.3d 250, 253–54 (Tex. 2010) (recognizing indigent parents are entitled to appointed counsel in parental rights termination cases); *In re S.R.*, 452 S.W.3d 351, 371 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (same).

15

The trial court appointed an attorney ad litem to represent Mother's interests on the day suit was filed. That lawyer, Johnson, continuously represented Mother for 17 months. Mother does not contend the trial court deprived her of her right to counsel during that period. Instead, she suggests the trial court's eleventh-hour granting of Johnson's motion to withdraw violated Mother's right to counsel.

Johnson filed a motion to withdraw one week before trial based on communication from Mother the previous night suggesting Mother wanted a different lawyer. According to Johnson and counsel for the Department, Mother had done something similar within the past month. Mother's sworn statements at the hearing indicate she indeed contacted two lawyers to replace Johnson, both of whom declined to represent Mother. There is no suggestion in the record that Johnson would have sought to withdraw had Mother not communicated her desire to replace Johnson. The timing of Johnson's motion to withdraw was based entirely on Mother's timing in telling Johnson she wanted a new lawyer.

Mother did not file a written response to the motion to withdraw in the six days between when the motion was filed and when it was heard. Nor did Mother express any opposition to withdrawal at the hearing. To the contrary, she told the trial court Johnson was "wonderful" and "great," but she wanted a new lawyer. Mother did not ask the trial court during the hearing to appoint her a new lawyer— she implied she would retain one herself. She did not ask for appointed counsel until the day of trial.

The trial court was uniquely familiar with the history and personalities in this case. The court was free to consider both in deciding whether to permit Johnson to withdraw. *See Harrison*, 557 S.W.3d at 119. Under these circumstances, we cannot say the trial court abused its discretion in granting Johnson's motion to withdraw.

## B. Continuance

Texas Rule of Civil Procedure 251 governs motions for continuance. A motion for continuance shall not be granted without "sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. Accordingly, motions for continuance generally must be in writing, state the specific facts supporting the motion, and be verified or supported by an affidavit. *Harrison*, 557 S.W.3d at 117. When a motion for continuance does not comply with the rules— for example, when the motion is unwritten or unsupported by verified facts— appellate courts generally presume the trial judge did not abuse its discretion in denying the motion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986); *see also In re S.M.H.*, 523 S.W.3d 783, 797 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Oral requests for a continuance do not preserve error. *Harrison*, 557 S.W.3d at 117.

Mother did not file a written motion for continuance. Her oral request on the day of trial is insufficient to preserve error for our review. *See id.* at 118 (concluding trial court did not abuse its discretion in denying pro se litigant's motion for continuance when record did not contain written, verified motion); *see also D.F. v. State*, 525 S.W.2d 933, 941 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (concluding trial court did not abuse its discretion in denying continuance even though counsel withdrew only one day before trial when appellant failed to file written motion for continuance pointing out sufficient cause supported by affidavit; instead, only unsworn oral motion for continuance urged on day of trial).

Even assuming Mother's oral request was sufficient to preserve error, we would conclude the trial court did not abuse its discretion in denying a continuance. When, as alleged here, the ground for a continuance is the withdrawal of counsel, the movant must demonstrate the failure to be represented at trial was not due to her own fault or negligence. *Villegas*, 711 S.W.2d at 626; *Harrison*, 557 S.W.3d at 117.

The "absence of counsel will not be good cause for a continuance or postponement of the cause when called for trial, except it be allowed in the discretion of the court, upon cause shown or upon matters within the knowledge or information of the judge to be stated on the record." Tex. R. Civ. P. 253.

The only basis for withdrawal stated in Johnson's motion is that Mother wanted a new lawyer. Mother did not disagree with that basis; she confirmed she wanted a new lawyer even though she thought Johnson was "wonderful." Mother has not satisfied her burden to show that her failure to be represented at trial was not due to her own fault or negligence.

We overrule Mother's first issue.

## II.  Managing conservatorship

Mother next asserts the trial court erred in terminating her parental rights. The trial court did not terminate her rights. As both the Department and Aunt did in their appellate briefs, we liberally construe Mother's issue to challenge the trial court's appointment of Aunt as the boys' managing conservator. *See* Tex. R. App. P. 38.9 ("Because briefs are meant to acquaint the court with the issues in a case and to present argument that will enable the court to decide the case, substantial compliance with this rule is sufficient, subject to" exceptions not relevant in this case.).

### A.  Legal standards

A managing conservator is the person or entity who, by court order, has been awarded custody of a child and may determine the child's primary residence. *See* Tex. Fam. Code Ann. § 153.371(1); *In re C.A.M.M.*, 243 S.W.3d 211, 215 n.7 (Tex. App.—Houston [14th Dist.] 2007, no pet). The managing conservator has nearly sole authority to make decisions for the child. *See* Tex. Fam. Code Ann. § 153.371(2)-(11). A managing conservator must be (1) a parent, (2) a competent

18

adult, (3) the Department, or (4) a licensed child-placing agency. *Id.* § 153.005(a).

Texas courts employ the "parental presumption"—that is, they presume a child's best interest is served by remaining with the child's natural parent. *Id.* § 153.131(a) (West 2014); *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990). That presumption is "deeply embedded in Texas law" and "based upon the natural affection usually flowing between parent and child." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). The trial court is required to appoint the parents as joint managing conservators unless it finds (1) appointment of one or both parents as managing conservator would significantly impair the child's health or development; or (2) there is a history of family violence involving the child's parents. Tex. Fam. Code Ann. § 153.131(a), (b). The party seeking appointment of a non-parent as managing conservator bears the burden to rebut the parental presumption. *In re K.S.*, 492 S.W.3d 419, 427 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

The best interest of the child shall always be the primary consideration of the court in determining conservatorship, possession, and access. *See id.* § 153.002. Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *Id.* § 263.307(a). Courts may consider the following non-exclusive factors to determine the child's best interest: the child's desires; the child's current and future physical and emotional needs; current and future emotional and physical danger to the child; parental abilities of the persons seeking custody; programs available to assist those persons seeking custody to promote the best interest of the child; plans for the child by the individuals or agency seeking custody; stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not

required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

We review conservatorship orders for an abuse of discretion. *In re R.T.K.*, 324 S.W.3d 896, 899 (Tex. App.–Houston [14th Dist.] 2010, pet. denied). A court acts within its discretion as long as there is "some evidence of a substantive and probative character" to support its decision on conservatorship. *K.S.*, 492 S.W.3d at 426. That discretion includes basing a decision on conflicting evidence. *In re M.M.M.*, 307 S.W.3d 846, 849 (Tex. App.—Fort Worth 2010, no pet.) (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998)). A court abuses its discretion when it acts unreasonably, arbitrarily, or without reference to guiding principles. *R.T.K.*, 324 S.W.3d at 899. Conservatorship determinations are governed by a preponderance-of-the-evidence standard. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). In this context, legal and factual sufficiency challenges are not independent grounds of error; rather, they are factors to be considered in determining whether the trial court abused its discretion. *K.S.*, 492 S.W.3d at 426.

## B. Application

Aunt is eligible to be the boys' managing conservator if she is a "competent adult." Tex. Fam. Code Ann. § 153.005(a). The record amply supports a finding that Aunt is a competent adult, and Mother does not suggest otherwise.

### 1. Parental presumption was rebutted

Due to the parental presumption, the trial court was required to appoint Mother as the boys' managing conservator unless it found that (1) appointment of Mother as managing conservator would significantly impair the boys' health or development; or (2) there is a history of family violence involving Mother. *Id.* § 153.131(a), (b). "Family violence" includes abuse by a member of a family or

20

household toward a child of the family or household. *Id.* § 71.004(2). "Abuse" includes a "physical injury that results in substantial harm to the child, or the genuine threat of substantial harm from physical injury to the child . . . ." *Id.* § 261.001(1)(C). In determining whether there is credible evidence of a history or pattern of past or present child neglect or abuse or family violence by a parent or other person, the court shall consider whether a protective order was rendered against the parent or other person during the two-year period preceding the filing of the suit or during the pendency of the suit. *Id.* § 153.004(f).

The judgement recites that Stepfather "would endanger the boys' physical health or emotional welfare," but it makes no such finding regarding Mother. However, the judgment states two findings regarding family violence:

- Stepfather "has a history or pattern of committing family violence during the two-year period preceding the filing of this suit or during the pendency of this suit."

- The boys "have a protective order against [Stepfather] in Cause No. 18-DCV-250361.

The trial court heard evidence that all three boys told the forensic interviewer that Mother knew about Stepfather's abuse. The judge's admonition to Mother at the hearing on entry of judgment makes clear he believed Mother to be "involved" in the family violence by Stepfather. The record supports a finding that there is a history of family violence involving Mother. Therefore, the parental presumption was rebutted.

### 2. No abuse of discretion in appointing Aunt as managing conservator

If there is "some evidence of a substantive and probative character" to support the trial court's decision to appoint Aunt as managing conservator, we must conclude the court did not abuse its discretion in that appointment. *K.S.*, 492 S.W.3d at 426.

The vast majority of the evidence supports Aunt's appointment.

Chris and Kevin greatly improved behaviorally, academically, socially, and psychologically while in Aunt's care. Though Charlie did not demonstrate behavioral or academic problems before removal, he also progressed socially and psychologically. Chris consistently expressed a desire to live with Aunt over Mother. Kevin and Charlie vacillated as to where they wanted to live and ultimately decided they preferred Aunt. All three boys feared Stepfather, and their fear caused them anxiety and stress at the prospect of even visiting Mother, let alone living with her. The Department supervisor assigned to the case, the boys' therapist, and their guardian ad litem each believed it was in the boys' best interest to live with Aunt.

We conclude the trial court did not abuse its discretion in appointing Aunt to be the boys' managing conservator. We overrule Mother's second issue.

## CONCLUSION

We affirm the trial court's judgment.

/s/     J. Brett Busby
        Justice

Panel consists of Justices Busby, Brown, and Wise.