**Affirmed and Memorandum Opinion filed June 20, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00278-CV

## IN THE INTEREST OF B.G.G., A/K/A A.G., AND J.J.G., A/K/A J.G., CHILDREN

**On Appeal from the 309th District Court
Harris County, Texas
Trial Court Cause No. 2017-60051**

## M E M O R A N D U M    O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. Tex. Fam. Code Ann. § 109.002(a-1). The children are Josh and Ana.[1] The appellant is their mother (B.N.G.). The trial court terminated Mother's parental rights to both children. The court appointed joint permanent managing conservators for Josh: his father, Michael; his paternal grandparents (Michael's Parents); and the Texas Department of Family and Protective Services (the Department). The court appointed the

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

Department as Ana's sole permanent managing conservator. On appeal, Mother contends (1) the trial court abused its discretion in denying her oral motion for continuance, and (2) the evidence is legally and factually insufficient to support termination. She does not challenge the conservatorship appointments. We affirm.

BACKGROUND

In early September 2017, Mother, 34 weeks pregnant, arrived at a hospital leaking fluids and experiencing contractions. She tested positive for amphetamine in her urine. Mother needed a C-section, and both she and the fetus risked death if she did not have one at that time. When told she needed a C-section, Mother said she "might as well" kill herself but claimed she was being sarcastic. Less than 10 hours after entering the hospital, Mother left against medical advice despite knowing the risks to both her and her unborn child. Mother's expressed suicidal ideation and the risk she took with her own life led to a referral to the Department alleging neglectful supervision of Josh, then 16 months old and in Mother's care. Mother returned to the hospital later that day without Josh.

Ana was born the next day. Her meconium tested positive for both amphetamine and methamphetamine. Mother tried to leave with Ana shortly after birth, again against medical advice. The hospital prevented her from taking Ana, but Mother left. The hospital did not know the identity of Ana's father.

With Mother gone and no known father, the Department filed this lawsuit for protection, conservatorship, and termination with respect to Ana. Following a full adversary hearing, the trial court appointed the Department as Ana's temporary managing conservator. The trial court later signed an order approving the family service plan the Department created for Mother and requiring her to comply with that plan.

The Department could not locate Josh or Mother until February 2018, when

2

the Department received a referral alleging neglectful supervision by Mother of Josh, then 22 months old. The reporter said Mother was "under the influence of something." Mother allegedly had no food for Josh but instead had given him a gallon of milk. She allegedly was acting erratically, could not say Josh's name, and had urinated on herself.

The Department sought temporary managing conservatorship of Josh, which the trial court granted, and amended its petition to include a request for protection, conservatorship, and termination regarding Josh. The trial court signed another order approving and requiring Mother to comply with a family service plan regarding Josh.

## TRIAL

Trial began on November 12, 2018, some 14 months after the Department was appointed as Ana's temporary managing conservator. The record indicates the trial date for Ana's case had been extended to align with that of Josh's case.

### A.  Request for extension of dismissal date or continuance of trial

Before the introduction of evidence, Mother's counsel made an oral motion to "extend this case," which appears to refer to extension of the 12-month dismissal deadline under section 263.401 of the Family Code. Counsel stated:

> [M]y reasons for that would be my client just got a job. She just found a place to live. She's working her services again and she would like to get an opportunity to continue working her services, Judge. If this Court allows her, she would be able to finish her services before the extended dismissal date.

Alternatively, counsel asked the trial court for a continuance of the trial:

> And in the alternative, Judge, I would just ask then for a continuance of the trial date so that my client could have, at least, until January or February to show the Court her progress on her services.

The Department opposed both requests. Counsel for the unknown father (later

3

appointed as counsel for Michael) said he did not oppose either request. The trial court denied both requests.

## B.    Evidence

Mother, caseworker Tyheshia Gillum, and Michael testified at trial. The parties stipulated to admission of the following exhibits: decrees from previous Department lawsuits involving three of Mother's other children; the Department's investigation report in this case; Mother's family service plans for Josh and Ana; and two orders signed by the trial court. The final exhibit, the results of a DNA test confirming Michael is Josh's father, was admitted into evidence without objection.

### 1.    Mother

#### a.    Department history

Mother gave birth to seven children; Josh and Ana were the sixth and seventh, respectively. The names and ages at trial of her older five children are: (1) Nathan, 15; (2) Alison, 12; (3) Dana, 8; (4) Michelle, 6; and (5) Jennifer, 4. The Department received a referral regarding danger to each child at least once. Mother's parental rights have not been terminated, but she does not have custody of any of her children. Nathan lives with Mother's father; Alison lives with her paternal grandparents; Dana and Michelle live with their paternal grandmother; and Jennifer lives with Michael (who is father to both Jennifer and Josh) and Michael's Parents.

Mother's history with the Department began when Nathan was one month old. Department records indicate Nathan was reportedly being exposed to a hostile and dangerous home environment due to altercations between Mother and her mother (Grandmother), Mother's drug use, and Mother's lack of parenting skills. The Department ruled out the allegations without explanation but referred the case to Family Based Safety Services (FBSS). FBSS closed the case 11 months later, noting

4

the family was more stable and seemed to be protective of Nathan.

Just four months later, though, the Department received another referral regarding Nathan. A psychiatrist had reportedly stated both Mother and Grandmother appeared to suffer from mental illness. Mother "displayed bi-polar affect and was hostile." She was said to be "a heavy drug user that is always intoxicated" and "actively uses narcotic pills, marijuana, alcohol, PCP, cocaine, and any drug she can ingest." Grandmother had allegedly relapsed and was using drugs again. Mother was rarely home, the reporter contended, so Grandmother was Nathan's primary caretaker. Nobody else took care of Nathan when Mother and Grandmother were intoxicated. Once again, the allegations were ruled out.

The next referral came three and a half years later, in July 2008, alleging negligent supervision of Nathan and Alison by Mother, by then "deemed homeless." The reporter cited Mother's anger and worried the children "may be a pawn for [Mother's] anger." The referral stated Mother had bipolar disorder but was not taking her medication. The Department ruled out the allegations of physical abuse and neglect but found reason to believe the allegation of negligent supervision. The case was referred to FBSS. FBSS closed the case in October 2009 because Mother agreed to allow her children to be in her parents' (Grandparents) care.

In August 2012, a referral to the Department again cited Mother's impaired judgment due to her continued drug abuse and untreated mental illness. The reporter alleged Mother was unable to care for Dana and Michelle. Mother did not communicate with the Department or take a drug test. The Department removed the two girls and was named their temporary managing conservator. Fourteen months later, the girls' paternal grandparents were named their permanent managing conservators. Mother and the girls' father were named possessory conservators entitled to supervised visitation with their daughters.

The final referral before this case began came in January 2014, when Mother and Jennifer both tested positive for cocaine at Jennifer's birth. The Department removed Jennifer and remained her temporary managing conservator for more than a year. Department records indicate Mother was "uncooperative" with the Department. Joint managing conservatorship of Jennifer was awarded to Michael, Michael's Parents, and Grandparents in February 2015.

### b.   Drug abuse

Age 32 at the time of trial, Mother began using drugs when she was 14. She said she did not know what drugs she used in the beginning. Use quickly progressed to habit. In her words, addiction had been "an ongoing problem for a very long time."

Mother used drugs during at least three of her pregnancies: Jennifer, Josh, and Ana. As stated above, Mother and Jennifer tested positive for cocaine when Jennifer was born. Mother said she believed she used methamphetamine, amphetamine, cocaine, and marijuana during the early part of her pregnancy with Josh. The record suggests she stopped using drugs once she learned she was pregnant. Mother resumed her drug use at some point. She said she was not sure what drugs she used during her pregnancy with Ana but thought it was only methamphetamine. She acknowledged she tested positive for amphetamine at Ana's birth. Ana was positive for both amphetamine and methamphetamine.

Mother testified she began drug rehabilitation treatment "a few times"— "maybe three" in the 15 years since Nathan was born. She did not complete any of those rehabilitation programs. She admitted taking methamphetamine, amphetamine, cocaine, and possibly "pills" in 2018. She said she went to a ministry for drug treatment in early March 2018, shortly after Josh was removed, and had been sober since that time. Mother acknowledged she knew the trial court did not accept that ministry as a drug rehabilitation program because its personnel were not

6

licensed to treat drug dependency. One person affiliated with the ministry had earlier testified they could "pray the addiction away." Gillum made clear to Mother the importance of seeking proper treatment for her addiction. Mother testified she left the ministry after five months and did not complete its one-year program.

### c. Service plan

The Department created a service plan for Mother with many goals, including: accept the responsibility of being a parent, protect Josh and Ana from harm, and provide them with basic necessities. To help her achieve those goals, Mother's service plan included several requirements specifically aimed to curb her drug abuse:

1. ***Substance abuse assessment.*** Participate in a drug and alcohol assessment and follow all the assessor's recommendations.

2. ***NA/AA meetings.*** Attend and participate in 90 one-hour Narcotics Anonymous/Alcoholics Anonymous (NA/AA) meetings in 90 days; obtain a sponsor of the same gender who has been sober for 10 years; work with the sponsor to develop an After Care plan and activities to maintain sobriety; and provide caseworker with sign-in sheets from meetings and contact information for the sponsor.

3. ***Relapse Prevention Plan.*** Complete a Relapse Prevention Plan and submit it to the caseworker within 30 days after the status hearing (presumably the status hearing at which the trial court approved the family service plan).

4. ***Random drug testing.*** Submit to random drug testing twice a month on the day the request is made; failure to comply will be considered a positive result.

Mother largely failed to satisfy the drug-abuse portion of her service plan. She admitted she did not participate in a substance abuse assessment. She admitted she did not attend 90 NA/AA meetings in 90 days. One week before trial, she provided documents purporting to be meeting sign-in sheets to Gillum. However, Gillum testified the documents were notebook paper that did not come from the NA/AA facility. Further, Gillum said, the staff at the facility said they did not know Mother.

Mother completed a Relapse Prevention Plan, which she described as "to stay connected with my church family and my AA, to work my steps, to work with others and just not go back." But she did not provide the plan to Gillum until a week before trial. Finally, Mother failed to appear for "well over 20" random drug tests.

The service plan also required Mother to complete parenting classes; participate in a psychological evaluation and follow all recommendations by the evaluator; refrain from participating in any criminal or illegal activity; obtain and maintain legal employment and stable housing, both for at least six months, and provide appropriate documentation to the caseworker; and attend all hearings, family visits, meetings, and conferences.

Mother completed parenting classes. She underwent the psychological evaluation but did not follow the recommendations of participating in a psychiatric evaluation, psychiatric treatment, a substance abuse assessment, and substance abuse counseling. Mother contended she never received the list of recommendations. Gillum testified she emailed the list to Mother's lawyer.

Mother worked only sporadically throughout this case. In the week before trial, she was hired at Stein Mart and a restaurant. She was scheduled to attend Stein Mart orientation two days after the first day of trial. She said she was "waiting on corporate to call back" before beginning work at the restaurant.

Eight days before trial began, Mother met "a friend of a friend." They agreed she would rent a room from him, and she moved in the next day. She did not conduct any background checks on him. She did not ask if he had a criminal history. She asked if he would be able to pass a drug test but did not inquire further about whether he uses drugs. She testified, "I just spoke with him and we've talked and I know he's religious, a very religious man, and things of that nature and that's it."

Mother did not visit or try to visit Ana in the five-month period between Ana's birth and Josh's removal. She testified she did not ask to see Ana because she was scared the Department would take Josh from her. Once Josh was removed, she visited both children.

### d.     Criminal history

The Department's investigation report identifies multiple times Mother was arrested. Mother pleaded guilty to robbery in 2003, for which she was placed on community supervision for four years. In 2009, Mother was charged with and pleaded guilty to discharging a firearm in certain municipalities. She was sentenced to four days' confinement. She was arrested in 2011 for both criminal trespass and criminal mischief. The trespass case was dismissed, and she was sentenced her to serve 15 days in jail for criminal mischief. Near Christmas 2012, she was arrested for possession of an unspecified controlled substance. She was placed on community supervision for two years. She pleaded guilty to another possession charge nearly two years later; that time, the criminal court sentenced her to 284 days' confinement. And in 2015, she was charged with and pleaded guilty to theft of property valued between $50 and $500, for which she was sentenced to serve 30 days in jail.

Mother testified she had no criminal cases pending at the time of trial. She estimated it was "probably last year" that she was arrested for drug possession.

### e.     Misstatements about and avoidance of the children's fathers

Mother testified she did not know the identity of Josh's or Ana's fathers. That testimony was consistent with her previous statements to the Department and to the hospitals where those children were born.

Shortly into her testimony, though, Mother changed her story. She admitted Michael is Josh's father and a man named Julio is Ana's father. She said she lied

because she assumed Michael, who is also Jennifer's father, would seek and be awarded custody of Josh as he had with Jennifer.

Michael appeared for the second day of trial, which was nine days after the first. He testified Mother told him when she was five months pregnant with Josh that the baby could be his. Since that time, Michael said, he had tried extensively to locate Josh by contacting Mother, her mother, and her brother through Facebook. Nobody replied to him, and Mother blocked him from contacting her. Michael said Mother never told him Josh was in the Department's care, even when he had contacted her recently:

> I had recently got in contact with her through another FaceBook account. I had to make another one to get in contact with her. And I asked about [Josh]; how is he doing; what's go [sic] on; can I see him; can I help. And she just blocked me. She never answered me back.

Michael confirmed Mother, as Jennifer's possessory conservator, has always had the right to visit Jennifer. He said Mother had visited her only three times or so.

### 2. The children

Josh was behind his developmental targets when he came into Department care at 22 months old. He had speech and social delays. He received social therapy and individual play therapy once he was placed foster care. Josh was still attending those sessions at the time of trial. According to Gillum, Josh "is making great progress. He's still developing, but he has made, like sufficient progress." Ana was said to be on target developmentally.

Both Josh and Ana were in a foster home at the time of trial. They were reportedly well bonded with their foster parents, and the foster parents were meeting all of their needs. The foster parents wanted to adopt both children. As of the first day of trial, Gillum and the children's attorney ad litem were happy with that

placement and wanted it to continue for both children.

Michael testified he wants custody of Josh. As discussed, Michael tried to see Josh and find out how he was doing but was thwarted by Mother and her family. Michael asked the court to name Michael's Parents as Josh's permanent managing conservators and name him as a possessory conservator. He wanted Josh and Jennifer, full-blooded siblings, to be raised together. Michael testified he was committed to keeping Josh and Ana in each other's lives through visits and communication.

The children's attorney ad litem advocated for Michael's Parents to be appointed Josh's joint managing conservators and Michael be named a possessory conservator. The attorney ad litem said the Department should be named Ana's permanent managing conservator.

Gillum testified the Department was unable to recommend Josh be placed with Michael or Michael's Parents because it had not conducted the relevant background checks and home study. However, she knew Jennifer was placed with Michael and his parents, and she said she was not aware of "anything that would cause an immediate concern" regarding Josh's joining Jennifer in that placement.

## C. Trial court's findings

The trial court found Mother engaged in the conduct described in subsections D (endangerment by environment), E (endangerment by conduct), and O (failure to comply with court order) of section 161.001(b)(1). The court additionally found termination of Mother's parental rights was in Josh's and Ana's best interest. The trial court appointed the Department to be Ana's permanent managing conservator and appointed Michael, Michael's Parents, and the Department to be Josh's joint managing conservators. Mother timely appealed.

ANALYSIS

## I.    Termination

If sustained, Mother's challenge to the legal sufficiency of the evidence to support termination would result in rendition of judgment. If disposition of an issue would result in a rendition of judgment, we consider that issue before addressing any issues that would result only in remand for a new trial. *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201 (Tex. 2003); *In re S.R.*, 452 S.W.3d 351, 359 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Therefore, we consider the sufficiency of the evidence before turning to Mother's complaint that the trial court should have granted her motion to continue the trial.

### A.    Burdens of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

### B.    Predicate ground for termination: endangerment

Mother's second, third, and fourth issues challenge the legal and factual sufficiency of the evidence to support the trial court's findings under subsections D, E, and O of section 161.001(b)(1). For the reasons that follow, we conclude sufficient evidence supports the subsection E finding. We therefore do not review the subsection D or O findings. *A.V.*, 113 S.W.3d at 362.

### 1.    Legal standards

If a parent has had his or her parental rights terminated based on a finding under section 161.001(b)(1)(D) or (E), that finding may serve as the basis for a future

termination of parental rights. Tex. Fam. Code Ann. § 161.001(b)(1)(M) (allowing termination if parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state"). Because subsection M alone provides a sufficient basis to terminate parental rights based on a previous subsection D or E finding, due process concerns, coupled with the requirement for a meaningful appeal, mandate a court of appeals affirming a termination on either subsection D or E provide the details of its analysis. *See In re N.G.*, No. 18-0508, __ S.W.3d __, 2019 WL 2147263, at *4 (Tex. May 17, 2019).

Family Code section 161.001(b)(1)(E) requires clear and convincing evidence the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *S.R.*, 452 S.W.3d at 360. "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

A finding of endangerment requires evidence the endangerment resulted from the parent's conduct. *S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* at 361. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being

may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

### 2.      Application

***Substance abuse.*** A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A parent's drug use exposes the child to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Continued illegal drug use after a child's removal is conduct jeopardizing parental rights and may be considered an endangering course of conduct. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *L.G.R.*, 498 S.W.3d at 204.

Mother admitted to abusing drugs for 18 of her 32 years. She used drugs during at least three pregnancies, and at least two of her children were born with drugs in their systems. She admitted starting "maybe three" rehabilitation programs and completing none of them. Most recently, she sought treatment through a ministry she knew was not recognized by the court as a rehabilitation program. On the day Josh was removed, she was incoherent and under the influence of some intoxicating agent. She was sufficiently impaired that she reportedly gave her 22-month-old son

a gallon of milk.

Mother testified she was sober and committed to maintaining her sobriety. The trial court was free to discredit her self-serving testimony. *See H.R.M.*, 209 S.W.3d at 109 (fact finder is sole arbiter when assessing credibility and demeanor of witnesses). Moreover, substance abuse is "hard to escape," and the fact finder is "not required to ignore a long history of dependency . . . merely because it abates as trial approaches." *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The trial court may reasonably decide a parent's changes before trial are too late to impact the best-interest decision. *See J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made by [the parent] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."). Although a reasonable fact finder could look at Mother's attempts at sobriety and decide they justified the risk of keeping her as a parent, we cannot say the trial court acted unreasonably in finding the children's best interest lay elsewhere. *M.G.D.*, 108 S.W.3d at 514. It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the children's best interest for the considered judgment of the fact finder. *See id.* at 531 (Frost, J., concurring in judgment).

Mother complains on appeal that the Department did not offer drug test results or medical records. But she testified she used drugs for 18 years, including during three of her pregnancies, and she testified two of her children were born with drugs in their system. All the evidence cited in this section regarding Mother's drug use as endangering conduct comes from Mother's own testimony.

***Medical neglect.*** Neglect of a child's medical needs endangers a child. *See In re J.D.G.*, 570 S.W.3d 839, 852 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *In re A.L.*, 389 S.W.3d 896, 902–03 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

16

Less than 10 hours after arriving at the hospital leaking fluids and experiencing contractions, Mother left the hospital against medical advice. She left despite knowing she and her soon-to-be-born child risked death if she not did undergo a C-section at that time.

*Criminal activity.* A parent's criminal conduct and imprisonment are relevant to the question of whether the parent engaged in a course of conduct that endangered the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability he will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *S.M.*, 389 S.W.3d at 492.

Though not the focus at trial, Mother's criminal history is documented in the record. She pleaded guilty to multiple charges, including possession of controlled substances. It appears most, if not all, of her arrests occurred after the birth of her first child. Each time she engaged in criminal activity, she risked leaving her children without their mother.

## C. Best interest

### 1. Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, *id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in the best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

### 2. Application

Mother's sole argument with respect to the best-interest finding is that "nowhere in the record was it actually testified by any parties that termination was in the best interest of [Ana or Josh]." She cites no authority to support the proposition that evidence relevant to the *Holley* factors is legally insufficient to support a best-interest if no witness utters the phrase "best interest."

***Children's desires and needs.*** When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *L.G.R.*, 498 S.W.3d at 205; *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.–Houston [14th Dist.]

2014, no pet.). Josh and Ana were too young to express their desires. Gillum testified they are both bonded with and well cared for by their foster parents. Josh was not yet two years old when he was removed from Mother's care, and Ana never spent a day with Mother. At the time of trial, Josh had no relationship with Michael or Michael's Parents, so there is no evidence about their care for him.

*Endangerment.* Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27. Accordingly, the evidence of Mother's endangerment of Josh and Ana, discussed above, is relevant to the best-interest analysis.

*Service plan.* Mother failed to complete the majority of her service plan. Of note, she did not undergo a substance abuse assessment, she did not attend 90 NA/AA meetings in 90 days, and she missed "well over 20" random drug tests. Mother acquired her housing one week before trial, and that housing was a room in the home of a friend of a friend whom she had met the previous day. She testified she was recently hired for two jobs, but she had not started either of them.

***Willingness and ability to care for the children.*** Mother birthed five children before Josh and Ana. The Department received referrals regarding dangers to all of them, and none of them lived with Mother at the time of trial. Despite knowing of the risk of death to herself and unborn Ana, Mother left the hospital against medical advice. After Ana was born, Mother left her in the hospital and disappeared for five months. She actively avoided the Department because she feared it would remove Josh as well. Mother lied to hospitals and the Department by saying she did not know the identify of Josh's or Ana's fathers. When Michael inquired about his son, Josh, Mother refused to answer him and blocked him from further communication.

*Programs available.* There is no evidence about specific programs available

19

to assist Mother in parenting Josh and Ana.

***Stability of proposed placement.*** Josh's and Ana's foster parents were said to be meeting all of both children's needs. The Department believed Josh and Ana should remain in their foster placement, and the foster parents wanted to adopt them. Once Michael was identified as Josh's father, he came forward and stated unequivocally that he wants to raise Josh. Though the Department could not recommend placement with Michael and Michael's parents at that time, Gillum knew of no immediate concern with that placement.

### D. Conclusion on termination

Applying the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's findings that (1) Mother endangered Josh and Ana under subsection E of section 161.001(b)(1), and (2) termination of Mother's parental rights is in the children's best interest. We overrule Mother's second, third, and fourth issues.

## II. Continuance

In her first issue, Mother contends the trial court "commit[ted] reversible error" in denying her motion for a continuance. She does not challenge the court's denial of her oral motion to extend the dismissal deadline under Family Code section 263.401.

We review a trial court's ruling on a motion for continuance for an abuse of discretion. *In re C.F.*, 565 S.W.3d 832, 843 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). We may not overrule the decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding principles. *Id.*

Texas Rule of Civil Procedure 251 governs motions for continuance. A motion for continuance shall not be granted without "sufficient cause supported by

affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. Accordingly, motions for continuance generally must be in writing, state the specific facts supporting the motion, and be verified or supported by an affidavit. *C.F.*, 565 S.W.3d at 844. When a motion for continuance does not comply with the rules—for example, when the motion is unwritten or unsupported by verified facts—appellate courts generally presume the trial judge did not abuse its discretion in denying the motion. *Id.* Oral requests for a continuance do not preserve error. *Id.*

Mother did not file a written motion for continuance. Her oral request on the day of trial is insufficient to preserve error for our review. *See id.* Unlike the appellant in our recent decision in *In re L.N.C.*, Mother does not suggest the denial of her motion for continuance violated her right to due process. No. 14-18-00691-CV, __ S.W.3d __, 1900, at *5 (Tex. App.—Houston [14th Dist.] Jan. 31, 2019, pet. filed). Accordingly, *L.N.C.* does not govern this case. Mother's failure to preserve error precludes appellate review. *C.F.*, 565 S.W.3d at 844. We overrule Mother's first issue.

## CONCLUSION

We affirm the trial court's final decree.


/s/    Jerry Zimmerer
       Justice

Panel consists of Justices Christopher, Bourliot, and Zimmerer.

21