**Opinion issued November 8, 2022**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

## NO. 01-21-00654-CV

———————————

## IN THE INTEREST OF H.L.W. AND S.K.W., Children

———————————

### On Appeal from the 300th District Court
### Brazoria County, Texas
### Trial Court Case No. 91619-F

———————————

## MEMORANDUM OPINION

In this accelerated appeal, Father challenges the trial court's order, entered after a bench trial, terminating his parental rights to his minor children, H.L.W. and S.K.W. In his first seven issues, Father contends that the evidence is legally and factually insufficient to support the trial court's predicate findings for termination under Family Code Section 161.001(b)(1) and that termination of his parental rights

are in his children's best interest. In his eighth issue, Father contends that the trial court abused its discretion by denying him his right to counsel.

We affirm.

## Background

The two children in this case, H.L.W. and S.K.W., were 13 and 12 years old, respectively, at the time of trial and the two children of Father and Mother. The children resided with Mother and her boyfriend, E.Z., before the Texas Department of Family and Protective Services (DFPS or the Department) removed them in May 2017. DFPS removed the children from Mother's home after receiving and investigating a report of neglectful supervision and sexual abuse. The affidavit attached to the petition indicated that there were concerns that H.L.W. and S.K.W. stated that E.Z. had sexually abused them and that Mother knew of the sexual abuse but did not want to contact police.[1] The affidavit also detailed Father's prior Child Protective Services (CPS) history from Texas and New Jersey, which included prior allegations of domestic violence between Father and Mother, and sexual abuse of the children by Father when the family lived in New Jersey. Although the allegations of sexual abuse were investigated and determined to be not "founded," Father's

---

[1] E.Z. and Mother also had two children, A.Z. and J.Z., who were removed from the home by DFPS and were initially included in the underlying lawsuit. E.Z. voluntarily relinquished his rights to A.Z. and J.Z., and the termination proceedings against Mother related to A.Z. and J.Z. were severed from the underlying termination suit related to H.L.W. and S.K.W.

2

visitations with the children were suspended by a court order and a CPS case in New Jersey remained open. The family then moved back to Texas from New Jersey in 2016. Because DFPS could not locate a suitable placement for the children, DFPS sought temporary managing conservatorship of the children.

The trial court entered a temporary order, dated May 3, 2017, which named DFPS as the temporary conservator of H.L.W. and S.K.W., following a hearing conducted pursuant to Texas Family Code Section 262.201. A week later, the trial court appointed counsel, Papa Dieye, to represent Father in these proceedings. On June 21, 2017, DFPS filed a status report with the trial court, recommending that Father "participate and successfully complete the family plan of service." Service plan goals for father included that he: (1) "demonstrate the willingness and ability to protect the child from harm," (2) "demonstrate an ability to provide basic necessities such as food, clothing, shelter, medical care, and supervision for the child," (3) "demonstrate the ability to protect child[ren] from future abuse or neglect, and will show concern for future safety of the child[ren]," and (4) "demonstrate an ability to change the pattern of behaving that resulted in abuse/neglect."

A Status Hearing was held on June 22, 2017, and an order entered on June 23, 2017. The trial court found that "the goal of the service plan is to return the children to the parents, and the plans adequately ensure that reasonable efforts are being made

3

to enable the parents to provide a safe environment for the children." The order made the family service plan for Father an order of the court.

On July 24, 2017, Dieye, Father's first court-appointed counsel, filed a motion to withdraw, citing an inability "to effectively communicate with [Father] in a manner consistent with a good attorney-client relationship. [Father] agrees to the withdrawal." Dieye explained at a hearing on his motion to withdraw that Father had "fired" him from the case and that he no longer wanted Dieye to represent him. The trial court granted the motion to withdraw and appointed Cortez Pouncil as Father's counsel.

On February 22, 2018, the trial court conducted a subsequent permanency hearing. At the hearing, Samantha Fernandez, CPS caseworker assigned to Mother, testified that Father had not started any services required under his family service plan. The trial court entered a subsequent permanency hearing order before final order on February 26, 2018, and found that Father had not demonstrated "adequate and appropriate compliance with the service plan." The trial court ordered that Father was to have no visitation with the children.

On July 26, 2018, the trial court conducted a permanency hearing and special review, at which Stephanie Sammons, a CPS supervisor, testified that Father was not engaged in his family plan. She testified that when she initially met with Father regarding setting up services, he "stormed out of the meeting" and said he was "not

4

going to participate in services." Sammons testified that CPS's later attempts to contact Father had not been successful and that they did not know if he was "clean and sober" or if "he has a safe and stable home." Sammons also testified that CPS's concerns about placing the children with Father stemmed from the no-contact order from New Jersey.

On October 15, 2018, at a hearing on the merits, the trial court heard testimony related to an agreement reached between DFPS and Father. Father testified that he agreed that there was clear and convincing evidence that he had engaged in conduct supporting termination under subsection (O), but that there was not clear and convincing evidence that termination was in the best interest of the children. Father also testified that they agreed he would not be named as possessory conservator, but that he would have the right to be informed of medical and educational information, that he would be entitled to at least two monthly telephone calls with the children, as well as the potential for in-person visitation, if agreed, and he would continue engaging in the services required by the family service plan. At the conclusion of the hearing, the trial court permitted Father to have three CPS-supervised visits with the children at the courthouse. A final order was signed by the trial court reflecting these findings.

On November 9, 2018, DFPS filed an emergency application for writ of attachment stating that Mother and Father were in violation of the trial court's

October 15th judgment because they took possession of the children and hid them from DFPS. In the affidavit attached to the emergency application, DFPS caseworker, Chevelle Bosier, stated that she received a phone call from the children's foster parent who stated that the children did not return home after school, but instead went to a friend's house. When Bosier and the children's attorney ad litem arrived at the friend's house, the friend's mother told them that H.L.W. said her mother was coming to pick up the children, and that the children left in a gray-colored SUV. Ultimately, Bosier was informed that Father had possession of the children, and he told Bosier that Mother had kidnapped their children and brought them to him in Surfside. Father refused to return the children to CPS because the children indicated they were unhappy in the foster home.

The parties entered into a Rule 11 Agreement on November 19, 2018, in which they agreed to temporary orders that neither Mother nor Father would have any contact with the children until further order from the court. The trial court entered a temporary modification order on December 2, 2018, in light of the parties' agreement.

On January 10, 2019, DFPS submitted a Permanency Report to the trial court, which included updates on the progress of the case and a recommendation that DFPS continue as permanent managing conservator and that H.L.W.'s and S.K.W.'s

6

placements in foster care be continued. The trial court entered a placement review order on January 14, 2019, approving of the children's placement in foster care.

On May 16, 2019, Father's second court-appointed counsel, Cortez Pouncil, filed a motion for withdrawal of counsel, stating that Father no longer wished to retain Pouncil as his counsel and he wished to represent himself. The motion stated that good cause existed for Pouncil's withdrawal because he was unable to "effectively communicate with [Father] in a manner consistent with good attorney-client relations."

The trial court held a hearing on Pouncil's motion to withdraw on June 6, 2019. Pouncil stated at the hearing that he was not able to effectively represent Father, and that Father agreed to the withdrawal and requested that the trial court appoint him another attorney. The trial court granted the motion to withdraw but did not appoint another attorney as there was not a pending case at that time.

On June 19, 2019, DFPS submitted a Permanency Report to the trial court, which included updates on the progress of the case and included a note that, although the caseworker had set up a drug test for Father on three separate occasions, he only appeared for one and left the drug-testing site before submitting to the test.

On September 29, 2019, DFPS filed an original petition to modify the trial court's November 19, 2018 prior final order. With respect to Father, DFPS sought

to terminate his parental rights under subsections (D), (E), (N), and (O) of Section 161.001(b)(1) of the Texas Family Code.

On December 4, 2019, DFPS submitted another Permanency Report to the trial court, which included updates on the progress of the case as well as a recommendation that DFPS continue as permanent managing conservator and that H.L.W.'s and S.K.W.'s placements in foster care be continued. The primary permanency goal was listed as unrelated adoption; the concurrent permanency goal was listed as family reunification. Specifically, with respect to Father, the Permanency Report included the following notes and recommendations:

- "Caseworker requested [Father] to submit to a drug test on 6/19/19 and he was a no show. On October 31, 2019 [Father] demanded caseworker to send him for a drug test and caseworker explained to [Father] that drug test are random. [Father] took upon himself to go the drug testing site. [Father] admitted that he will test positive for alcohol, but nothing else. On November 12, 2019[,] [caseworker] requested [Father] submit to a drug test by 11/13/19 before 4pm. [Father] replied 'No! I've tried to get a hold of you. You want to base this on your grounds. I am properly represented by counsel.'"

- "Father continues to be rude to caseworker by using profanity and calling her names. . . . On November 16, 2019 [Father] informed caseworker that he currently [is] not being represented but will be. He also stated that he is was [sic] not able to conversate regarding his upcoming case."

On December 19, 2019, Father informed the trial court that he did not want an appointed attorney and that he wanted time to hire his own counsel. As a result, the trial court reset the final hearing on the merits to provide Father time to either

hire an attorney to represent him, or to request that the trial court appoint an attorney for him.

On May 26, 2020, DFPS submitted a Permanency Report to the trial court, which included specific recommendations and notes as to Father:

- "At this time [Father] has not provided the Department with contact information of his attorney. [Father] refused to initiate or complete services until he has proper representation. . . . Caseworker informed [Father] of the upcoming court hearing and requested for an address to send him his Family Plan of Service. [Father] replied 'but you can stick that family plan up your f****** fat black ass.'"

- "[Father] continues to call caseworker . . . name[s], being rude and disrespectful."

- "The recommendation[] of the Department is move forward to terminate parental rights of [Father] and [mother] . . . . The Department has given the parents an extended amount of time to complete services so the children . . . can be reunified. [Father] and [mother] are not compliant with their family plan of services."

On September 16, 2020, DFPS moved for injunctions to prevent Father from contacting the caseworker, Bosier, based on threatening voicemails, emails, and text messages Father sent Bosier, including threats to Bosier's children. DFPS also sought an injunction to prevent Father from contacting any DFPS employee in a threatening manner. DFPS also sought a protective order preventing Father from removing the children, communicating with any member of the children's household in a threatening manner, and going to or near the residence, school, or childcare

facility of the children. After a hearing on September 24, 2020, the trial court entered a protective order and order granting injunctions.

On March 19, 2021, DFPS filed a first amended petition to modify prior order, seeking to terminate Father's parental rights under Section 161.001(b)(1)(D), (E), (F), (N), and (O). On April 6, 2021, Father filed a motion to withdraw as pro se counsel and sought the representation of a court-appointed attorney. The trial court found Father to be indigent and appointed Ricardo Contreras as counsel for Father.

On April 27, 2021, DFPS submitted a Permanency Report to the trial court, which included the following notes with respect to Father:

- "[Father] was arrested on March 1, 2021 for DWI; he is currently incarcerated at Brazoria County Jail."

- "Caseworker will communicate with his attorney regarding [Father's] services. Caseworker [will] continue to communicate with [Father] through CPS attorney. On January 27, 2021 caseworker sent a letter through CPS attorney asking to take a drug test. [Father] on January 29, 2021 and this was [Father's] response[:] 'What is wrong with your brain Lauren [DFPS counsel] I mean you are so adamant about me taking the drug test I'm going to pass you know I have a certification from the state of which I have a life legal resident of Colorado I have certification that says that I am allowed to get to Oz from every dispensary everyday a call I mean I get 50 pounds a day okay. I'll take another fish [sic] test Saturday if I get a visit but I am not going to just I mean you're going to have to give up something you're going to have to give up something. UA you get me visitation with my girls and I will get visitation before I take the UA so I mean you're not running s*** no more Lauren you're not running s***."

- "[Father] continue[s] to communicate his hatred toward caseworker, [stating] you can tell that n***** b**** that I am not cooperating with anything until I see my girls. I get a visit with my girls I get the restraining order off I go in front of guns pack and get that restraining I don't even want to talk to that

10

Niger [sic] I hate her f****** got some more and I hate you you know I don't care I'm not I'm not pulling any punches I do not like you I do not like her. everyday think about how much I would love to hear that your children got killed in the car accident that you got killed in the car accident but that Niger [sic] got killed in a car accident'"

This case was set for trial on May 26, 2021. The same date, Father's third court-appointed counsel, Contreras, moved for a continuance, citing his recent appointment and personal tragedy, and filed a request for a jury trial. The trial court denied the motion for continuance and denied the jury request as untimely, began trial briefly, but ultimately recessed for approximately 60 days (until July 19) to allow Contreras additional time to review discovery that was produced by DFPS shortly before trial.

Despite being represented by counsel, on July 12, 2021, Father filed a pro se motion to recuse or disqualify the trial judge, the Honorable Randall Hufstetler. Father also filed a pro se motion to dismiss the case alleging that his constitutional rights to a trial by jury were being denied and that he needed adequate time to prepare for trial. Although he did not file it with the trial court, Father also sent Contreras a pro se motion for change of counsel, in which he alleged that Contreras was "ineffective, mentally unfit, and highly suspected of coercion with the Court and prosecution."

At a hearing conducted on July 19, 2021, the trial court addressed Father's pro se filing of the motion to recuse, and explicitly asked Father whether he wanted to represent himself or have Contreras continue in his representation:

THE COURT: My question was: What do you want to do? Represent yourself or have Mr. Contreras represent you? Because right now, you are filing motions as if you're representing yourself, but you have an attorney.

FATHER: I am assisting my counsel.

THE COURT: Say that again.

FATHER: I am assisting my counsel in my defense.

THE COURT: No, sir. That's not the way it goes. You represent yourself, you can file anything you want to file. If you have an attorney –

FATHER: I don't –

THE COURT: I'm talking right now. So, you're just going to wait. If you have an attorney, that attorney is the one that's going to represent you. So, he's not confused, so I'm not confused, so no one is confused, which one is it? Do you want to represent yourself or have Mr. Contreras represent you?

FATHER: He's representing me.

THE COURT: All right.

FATHER: He was appointed.

THE COURT: That's what I knew. But yet, I still see that you are filing motions on your own behalf.

FATHER: Yes, sir.

THE COURT: So, which is it?

12

FATHER: He's representing me, and I'm assisting in my defense.

THE COURT: Okay. So, you don't want to represent yourself.

FATHER: No, sir.

Contreras then questioned Father about his allegations against Contreras in the motion for change of counsel, during which Father confirmed that he wanted Contreras to continue representing him.

CONTRERAS: Okay. Now, we've met, we've discussed the case, and I – you've gone forward on the record here and said that you do want me to continue representing you now?

FATHER: Yes.

CONTRERAS: Are you sure of that?

FATHER: Yes.

CONTRERAS: Okay. Do you feel like we're prepared to go forward with trial today?

FATHER: Yes.

The trial court declined to recuse himself from the case and forwarded Father's motion to recuse to the Honorable Susan Brown, who denied the motion.

Trial was recessed until November 9, 2021. By the time this case proceeded to a trial on the merits, Father had been appointed three separate counsel by the trial court. Two of his previously appointed counsel filed motions to withdraw, which were unopposed by Father and granted by the trial court, citing their inability to effectively communicate with Father. The day before trial was set to resume, his

13

third-appointed counsel, Contreras, filed a motion for withdrawal of counsel stating that good cause existed for his withdrawal because Father had filed a complaint against him with the Chief Disciplinary Committee of the Texas State Bar and had filed (or planned to file) a grievance. Contreras noted in the motion to withdraw that Father did not consent to the motion. Contreras also sought a continuance so that Father could obtain new counsel.

At the beginning of trial on November 9, 2021, Contreras presented his motion to withdraw to the trial court. Contreras reminded the trial court that Father had previously given him the motion for change of counsel, in which Father claimed Contreras was ineffective, but ultimately chose to go forward with Contreras as his counsel. As demonstrated by the following exchange, the trial court, after hearing that Father had filed a grievance against Contreras, granted the motion to withdraw and found that, by his actions, Father had waived his right to counsel and was representing himself.

> CONTRERAS:  I visited [Father] last Friday, November 5th, 2021. He brought to my attention he's filed a grievance. In that grievance he states that I have divulged attorney/client privilege by using his motion for change of counsel before we began that trial and I questioned him about it. So that's the basis of his grievance. I thought we were past that and that he trusted me but on Friday he made it clear to me he doesn't trust me. He thinks I'm working against him and in conjunction with CPS and the DA's office and the Court to terminate his rights and being that along with the grievance filed against me, I ask to

14

withdraw. I don't think I can go forward with representing him based on his claims effectively. I can't communicate with him effectively when I do meet with him. He has communicated as recently as of last Friday and yesterday that he doesn't want me to withdraw but he doesn't trust me and he thinks I'm working against him and his interest –

FATHER: That's not what I said, Your Honor.

CONTRERAS: I can't effectively represent him with the claims he's made, coupled with the fact he's filed a grievance against me with the state bar.

FATHER: That's totally inaccurate, Your Honor.

THE COURT: Well, correct it, [Father].

FATHER: Excuse me. I never had that conversation with him.

THE COURT: So he's lying?

FATHER: I told him I filed a grievance. He's working for me. He's not done what I asked him to do. He divulged attorney client information by taking my paper work, copying it and highlighting it and depose me in front of the Court regarding my personal information. We already discussed I was not going to replace him and he had no business discussing that. He violated rule 105, you know. He just did. Because of his conduct, yes I believe that he was deficient in his representation. I did and we talked about it. But the fact of the matter is, I am not going to have my children taken because of my representation of myself. I'm not an attorney. I'm a layman. I need this attorney to represent me. He said he has facts pertinent to the case that I can fight for. So if he wants to do his job, he's working for me, you know, and I requested him to do certain things.

THE COURT: Did you inform Mr. Contreras that you have in fact filed a grievance against him?

FATHER: I did file a grievance against him.

THE COURT: Motion to withdraw is --

FATHER: Because of his conduct.

THE COURT: Stop. Be quiet.

FATHER: Sir?

THE COURT: Be quiet.

FATHER: Yes, sir.

THE COURT: Motion to withdraw is granted. Mr. Contreras you are released.

FATHER: I can't hear you. Can you put the microphone on?

THE COURT: Stop talking.

FATHER: I can't hear.

THE COURT: Stop talking. Did you hear that?

FATHER: Yes, sir.

THE COURT: I am granting the motion to withdraw. Mr. Contreras is released immediately.

FATHER: I object.

THE COURT: You can object all day long. We will make a note of it in the record. Based upon your continual delay tactics and your filing of baseless motions to try to continually delay this matter, I am making a finding that you have effectively by your actions waived counsel. Because everyone that has been appointed, you have complained about. You have told Judge Bradshaw that you have the funds to hire an attorney but you didn't. Mr. Contreras is the second or third attorney, third attorney that's represented you or attempted to represent you and you continue to complain about all of them. Some of the same

16

|   |   |
|---|---|
| | complaints, some are different but effectively you have by your actions told this Court through your actions, you don't want any of these people representing you because you keep complaining about them. Here's the deal. I am fine with you representing yourself. |
| FATHER: | I don't want to. |
| THE COURT: | Your actions say otherwise. Your words are meaningless to me. |
| FATHER: | I don't want -- I want effective assistance of counsel. |
| THE COURT: | If you're going -- I am talking right now. Right now you're representing yourself. |
| FATHER: | I am not. |
| THE COURT: | You are. I am going to let you. Did you hear what I said? He's done. So you don't have anybody else representing you because you keep complaining about them. Effectively you by your actions I am going to deem that you are now waiving your right to counsel. We are going to proceed. Actions speak louder than words. |
| FATHER: | May I speak, sir? |
| THE COURT: | No, sir, you can't. We are going to proceed. Your efforts to try to derail this case are done. They are over and we are going to proceed. |

The trial continued, with Father representing himself. During the direct examination of DFPS's first witness, Father announced that he was "done," that he wanted an attorney and did not want to represent himself, and that he was leaving and would file a notice of appeal.

17

FATHER:     Your Honor, I am done with these proceedings. I file a notice of appeal. I am done.

THE COURT:  I don't know what you're done with.

FATHER:     I am done.

THE COURT:  Are you –

FATHER:     You can make a directed verdict.

THE COURT:  You're telling me you want to leave?

FATHER:     I am done.

THE COURT:  That is not what I asked you.

FATHER:     I do want to leave. I am not representing myself to lose my children. I am not doing it. You can't force me to do it. I want an attorney to represent me that's going to do what I ask him to do that.

THE COURT:  [Father], I have.

FATHER:     Two of them have withdrawn. I didn't file –

THE COURT:  You complain. Stop for just a second.

FATHER:     You want to know why the other one quit? Because I filed with the attorney client assistance program.

THE COURT:  You keep complaining about the people that I hire to represent you. And I don't know who else you want to represent you.

FATHER:     I am not representing myself. I am a layman. I don't want to represent myself. I am not losing my children because of my representation.

THE COURT:  That's why you had three attorneys.

FATHER:     Two quit because they can't take an ass chewing.

THE COURT:  Well, maybe you shouldn't chew their ass.

18

FATHER: They work for me.

THE COURT: All three were hired by the county to represent you. You complained about all of them. You filed a grievance.

FATHER: No, I am about –

THE COURT: Stop. I am talking right now. The last one, Mr. Contreras, I'd be comfortable with Mr. Contreras representing me because he is one of the best CPS lawyers in the county. But you complained about every one that's been hired to represent you, you complain about. I don't know if you are chewing their ass or not but they have the right to represent who they want and if they don't want to take an ass chewing, they're not going to take an ass chewing.

FATHER: Sir, is it appropriate –

THE COURT: Stop.

FATHER: -- for him to divulge my information to you?

THE COURT: Stop. You hire them with your money, you can chew their ass. You hire them with the county's money, they decide whether they want to get out or stay in. The last one that representing you 15 minutes ago was hired to represent you, you filed a grievance against him.

FATHER: That's my job. That's my responsibility.

THE COURT: It's his while you have a grievance pending. So he's not -- I am not about to put a man to trial who you filed a grievance against –

FATHER: He told me he wanted to do it.

THE COURT: -- and put his license in jeopardy.

FATHER: He told me he wanted to represent you -- me.

19

THE COURT:    He's not going to represent you in any hearing because you filed a grievance against him.

FATHER:    I filed a grievance against you.

THE COURT:    We already dealt with that one.

FATHER:    No, you haven't. Not yet you ain't.

THE COURT:    You have done nothing but try to delay this process. If you want to leave, we are going to go on in the trial.

FATHER:    I object to this whole trial. I want an attorney representing me.

THE COURT:    You want to leave or stay? You want to leave or stay?

FATHER:    I am not waiving my right to. If you give me an attorney, I will sit right here.

THE COURT:    I am not giving you an attorney. You want to leave?

FATHER:    I want an attorney to represent me.

THE COURT:    You want to leave? For the record you're walking out?

FATHER:    I want an attorney to represent me.

THE COURT:    You're not going to answer my question, are you?

FATHER:    I am not going to represent myself.

THE COURT:    Do you want to leave?

FATHER:    Are you forcing me to represent myself?

THE COURT:    I am asking you, do you want to leave?

FATHER:    Give me an attorney and I will sit down.

THE COURT:    Have a seat. We're going to proceed.

| | |
|---|---|
| FATHER: | Give me an attorney. I am not representing myself. |
| THE COURT: | I am not forcing you. |
| FATHER: | I am not staying for the proceedings if you're not going to give me an attorney. |
| THE COURT: | You can proceed or you can leave. It's up to you. We are going to proceed. I am done with him. Hook him up and take him on. |
| FATHER: | I want a notice of appeal. |
| THE COURT: | That's something you have to file yourself. We are not done yet. Ms. Menia, we will proceed now without [Father]. |
| MS. MENIA: | Can I note for the record [Father] did leave. He voluntarily walked out with everything else trailing him. |
| THE COURT: | Absolutely. |

The trial continued in Father's absence, with Officer Paul Stackhouse testifying first. Stackhouse, an officer with the Iowa County Police Department, testified that he pulled Father over on Highway 288 around noon on March 1, 2021 for reckless driving. Stackhouse testified that he followed Father for a period of time, during which Father failed to maintain a single lane of traffic and failed to indicate a lane change. Stackhouse testified that when he stopped Father, he noticed that Father had glassy eyes, slurred speech, red liquid, later identified as cherry moonshine, in an open, unsealed container, dripping down his cheeks, and a large wet spot in the crotch of his pants. Stackhouse testified that he was unable to conduct a field sobriety test because Father refused. Stackhouse testified that Father appeared

21

extremely intoxicated, that Stackhouse had to assist Father into the backseat of his patrol car, and that Father was so intoxicated that he urinated on himself twice more, once in Stackhouse's custody. Stackhouse also ran Father's background, which came back with a felony warrant for retaliation based on Father's threatening assault on Bosier.

Dr. Sharon Mock, the individual therapist for S.K.W., testified next that S.K.W., who was 12 years old at the time of trial, first came to the Hill Country Youth Ranch in March 2020. When S.K.W. first arrived, she was "very reserved and shut down," and would get aggressive with her peers. Dr. Mock testified that in the year and a half that S.K.W. had been at the youth facility S.K.W. had "blossomed." S.K.W. has found ways to express herself, taken an interest in animals and dancing, and has become a very happy child. S.K.W. has bonded with a pastor of the church and the owners of the youth facility. Dr. Mock explained that S.K.W. had experienced a lot of trauma, including physical and sexual abuse by E.Z., but has worked through those experiences.

She also testified that S.K.W. had a history of lying about things so as not to get into trouble and would take things that were not hers. But Dr. Mock testified that S.K.W. has worked hard to change her behaviors. Dr. Mock testified that S.K.W. wants to be put in a foster home. Dr. Mock recommended S.K.W. be placed in a long-term foster care home, with the possibility of adoption.

Dr. Mock testified that S.K.W. felt abandoned by her parents and stated that her parents did not take care of her and she had to take care of her siblings herself. S.K.W. indicated to Dr. Mock that she did not want to go home with any of her family.

Camille Coffey testified next that she was H.L.W.'s therapist at New Life, a youth facility in Canyon Lake, Texas. Coffey testified H.L.W. had been at New Life since February 2021, and when she first arrived H.L.W. was "very dis-regulated, combative," and that she "punched several staff." H.L.W. regularly engaged in verbal and physical arguments with peers and staff, did not follow directions, and was "not happy to be there." At one point, H.L.W. became such a risk to the safety of others at the facility that they considered discharging her. However, Coffey testified that H.L.W. has made tremendous changes in her behavior and was even written up on the facility's monthly newsletter for her success. Coffey explained that H.L.W. has worked to be able to handle her verbal and physical aggression and has stopped lashing out. H.L.W. "seeks help, uses coping skills, walks away from stressful situations," and has become a very happy child. H.L.W. participates in individual and group therapy, sports, swimming, and other recreational activities, and participates in school.

Coffey testified that H.L.W. will eventually transition out of New Life and, when she does, H.L.W. has expressed that she "wants to go to a foster home" and to

23

be closer to her siblings. Coffey stated that H.L.W. has never mentioned wanting to go home with Father. She testified that H.L.W. has difficulty talking about the past and just wants to move on from it and feel better.

The children's caseworker, Bosier, testified next that she had been the children's caseworker since April 2018. She explained that the trial court's previous order had found that there were grounds to terminate Father's parental rights based on his failure to complete services, but that the trial court found that termination at that time was not in the children's best interest. At that time, Bosier stated that DFPS was trying to reunite the children with a family member or a friend, with plans to likely remain in contact with their parents. Both Father and Mother were cooperating and beginning to engage in services at that time. Bosier testified, however, that things changed.

In November 2018, after the trial court entered its previous order, Bosier testified that Mother kidnapped the children from their placement and gave them to Father in Surfside. She testified that Father called Bosier and tried to "negotiate about getting the girls back." Bosier testified that Father did not have permission to have the children and he did not give them up willingly. The children became very upset when Bosier, who was accompanied by her supervisor and two police officers, came to pick them up and return them to DFPS custody. When she went to pick up the children, Bosier stated that she observed "two big empty jugs, bottles of

24

whiskey" in the trash at Father's house and discovered that the children had not eaten anything but cookies since they had been there. Bosier stated that she had concerns about Father's drug and alcohol use at the time, and in her opinion, it was not safe for the children to be with him. Bosier testified that H.L.W. later told her that Father "put[] a gun to her face" while she was there with him in Surfside. Bosier also stated that H.L.W. had not indicated that she wanted to go home with Father.

DFPS also introduced Father's family plan of service as evidence at trial. According to the service plan, Father was required to complete a domestic violence class based on his history of and previous conviction for family violence. Bosier testified that, at the time of trial, Father had not completed this class. Bosier also testified that Father was required to maintain a safe and stable home and environment but failed to do so because he was incarcerated. She also testified that Father had moved around a lot and had refused to provide the Department with an address.

Bosier testified that Father was required to submit to random drug testing but, despite requests from Bosier, Father has adamantly refused to do so. Further, Bosier testified that Father failed to complete individual and family therapy, as well as the recommended parenting classes and outpatient drug and alcohol treatment. Bosier testified that Father did not provide her with any information regarding employment or receipt of any services such as Medicaid or food stamps. Bosier stated that Father

receives social security disability but does not have any other form of income that would allow him to support the children.

Bosier further stated that Father has a history of alcohol and drug abuse, which included a conviction for possession of marijuana. In medical intake records introduced from the Brazoria County Sheriff's Office, dated during the pendency of the underlying case, Father stated that he drinks liquor three times a week, had a history of alcohol abuse, was hospitalized for alcohol intoxication, and was alcohol dependent. Likewise, medical records from the Brazoria County jail indicate that Father had been diagnosed with cirrhosis of the liver due to alcohol abuse.

Bosier stated that both children were preparing for discharge from their facilities. She explained that there are two foster home options for the children. First, the children could be placed in a regular foster home where there are multiple children in the home or, second, they could be placed in a foster-to-adopt home where the family will be monitored to see if they are a good fit. Bosier testified that DFPS was asking to terminate the parental rights to both Father and Mother so that the children could be placed in a foster-to-adopt home and could obtain a sense of permanency. Bosier stated this is in the best interest of the children. She explained she had been their caseworker since 2018, that they had a previous CPS case, and that they had not had a sense of normalcy. "They need permanency . . . to let them move forward and be productive."

Boiser testified that Mother told her there was a history of domestic violence between Father and Mother and that the abuse occurred in front of the children. Bosier testified that Father had called and left threatening recordings for Mother, which Mother shared with Bosier. Bosier testified that Mother was concerned about Father's violent streak, that she was afraid he would hurt her, and that she believed her children needed to be protected from Father. Bosier also testified that Father had threatened her life and that the retaliation charge against Father was based on his conduct directed at Bosier as the victim. She stated that she believed Father was capable of and would act out in the manner in which he had threatened Bosier and that she and her family had taken precautions based on the threats made against her by Father.

At the conclusion of the trial, the trial court terminated Father's parental rights under Section 161.001(b)(1)(D), (E), (F), (N), and (O).

The trial court appointed counsel for Father on appeal. Father's first court-appointed appellate counsel filed an *Anders* brief stating her opinion that the appeal was frivolous.[2] After receiving a pro se brief from Father, this Court abated this matter and instructed the trial court to appoint new counsel to submit a brief on the merits addressing Father's claim that his statutory right to an attorney was denied and "any other grounds counsel deems appropriate."

---

[2] *See Anders v. California*, 386 U.S. 738, 744 (1967).

On August 5, 2022, Father's second court-appointed appellate counsel filed a final brief in which Father complains that the trial court denied him the statutory right to be represented by counsel. Father also challenges the legal and factual sufficiency of the evidence supporting the trial court's predicate findings for termination and the court's finding that termination of his parental rights is in the best interest of the children. We address those arguments in turn.

## Right to Counsel

In his eighth issue, Father argues that the trial court violated his statutory right to counsel when it permitted his attorney to withdraw and failed to appoint another attorney in his place.

## A. Standard of Review and Applicable Law

In termination suits filed by a governmental entity, the trial court "shall appoint an attorney ad litem to represent the interests of: (1) an indigent parent of the child who responds in opposition to the termination . . . ." TEX. FAM. CODE § 107.013(a)(1); *see also In re B.G.*, 317 S.W.3d 250, 253–54 (Tex. 2010) (recognizing indigent parents are entitled to appointed counsel in parental rights termination cases); *In re S.R.*, 452 S.W.3d 351, 371 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (same).

The Family Code provides that the attorney ad litem's duties continue until the termination proceedings are dismissed or finally concluded unless the attorney

is relieved or replaced "after a finding of good cause is rendered by the court on the record." TEX. FAM. CODE § 107.016(2). Section 107.016(2) provides:

> (2) an attorney appointed under this subchapter to serve as an attorney ad litem for a parent or an alleged father continues to serve in that capacity until the earliest of:
>
>> (A) the date the suit affecting the parent-child relationship is dismissed;
>>
>> (B) the date all appeals in relation to any final order terminating parental rights are exhausted or waived; or
>>
>> (C) the date the attorney is relieved of the attorney's duties or replaced by another attorney after a finding of good cause is rendered by the court on the record.

*Id.* Further, the statutory right to counsel in termination proceedings may be waived. *In re S.M.T.*, No. 13-17-00064-CV, 2017 WL 3084300, at *12 (Tex. App.—Corpus Christi–Edinburg July 20, 2017, pet. denied) (mem. op.).

We review a trial court's decision to grant an attorney's motion to withdraw for an abuse of discretion. *See In re C.F.*, 565 S.W.3d 832, 843 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). We may not overrule the decision unless the trial court acted unreasonably or in an arbitrary manner, without reference to guiding principles. *Id.*

**B.    Analysis**

Under these circumstances, we conclude that the trial court did not abuse its discretion in permitting Father's third appointed counsel to withdraw on the morning of trial. We find the facts here to be analogous to a case considered by the Fourteenth

29

Court of Appeals. *See id.* at 843–44. In *In re C.F.*, the Fourteenth Court considered whether the trial court violated the mother's right to counsel in termination proceedings by granting her appointed lawyer's motion to withdraw and denying her request for a continuance, which resulted in her proceeding pro se at the trial on the termination of her parental rights. *See id.* at 843. There, the trial court appointed an attorney ad litem to represent the indigent mother on the day DFPS's suit was filed. *Id.* The same lawyer represented the mother for seventeen months. *Id.* The lawyer then filed a motion to withdraw one week before trial based on a communication from her client received on the previous night indicating that she wanted a different attorney. *Id.* On the day before trial, the trial court granted counsel's motion and told the mother:

> I expect you to be here tomorrow and if you don't have counsel, then, you'll be pro se. I'm not saying that you purposely decided to have problems or there were problems ongoing for the past month or two but we've got a deadline and the deadline is the end of May. So, we're going to trial tomorrow with or without counsel from your perspective . . . .

*Id.* at 837–38. The next day, the trial court questioned mother about whether she retained counsel:

> The Court: And mom is here pro se. Did you get ahold of one of these lawyers.
>
> Mother: No, Your Honor. I want this case to go into continuance because I need time to get counsel and if you can provide me with one.
>
> The Court: Yeah. Well, I had one provided for you and you chose to get rid of her.

Mother: I didn't get rid of her. She quit.

The Court: Excuse me, I'm talking right now. We're not going to delay this case so that you can figure that you're going to get some advantage. I gave you ever[y] opportunity. . . . [Y]ou haven't worked with Ms. Johnson according to the testimony yesterday and you've talked to at least two lawyers and neither one of them are here this morning. So, you're going to be here pro se.

*Id.* at 838. On appeal, the Fourteenth Court concluded that the trial court did not abuse its discretion by allowing the mother's court-appointed attorney to withdraw the day before trial. *Id.* at 844. The court noted that the mother had been appointed counsel on the day the suit was filed, had representation throughout the proceedings, and the only reason counsel sought to withdraw on the eve of trial was because the mother communicated that she desired new counsel. *Id.* at 843 ("The timing of Johnson's motion to withdraw was based entirely on Mother's timing in telling Johnson she wanted a new lawyer."). The court explained that the trial court "was uniquely familiar with the history and personalities in this case" and "was free to consider both in deciding whether to permit [appointed counsel] to withdraw." *Id.* at 844. Accordingly, the court held that the trial court did not abuse its discretion in granting the motion to withdraw. *Id.*

Here, we are faced with similar, yet even more egregious facts. During the proceedings, the trial court appointed counsel for Father on three occasions. The first counsel was appointed a week after DFPS filed suit. Father's first two counsel withdrew because Father "fired" them or informed them he no longer wanted either

31

to represent him. After his second counsel withdrew in June 2019, Father proceeded pro se for almost two years. In December 2019, Father informed the trial court that he did not want an appointed attorney and that he wanted time to hire his own counsel. As a result, the trial court reset trial to give Father an opportunity to retain counsel. Father did not retain private counsel and, in April 2021, moved to withdraw as pro se counsel and requested the trial court appoint him counsel.

After being appointed his third counsel, Father continued to file a number of pro se motions, including a motion to recuse or disqualify the trial judge and a motion to dismiss the case alleging that his constitutional rights to a jury trial had been violated. Father also sent his appointed counsel a motion for change of counsel, in which he alleged that Contreras was ineffective and mentally unfit. Even after expressing his dissatisfaction with Contreras, in July 2019, Father informed the trial court that he wanted Contreras to continue representing him. Yet only four months later, four days before trial, Father informed Contreras that he had filed a grievance against Contreras with the State Bar of Texas and that he did not trust Contreras. It was only after Father continued to communicate his distrust in Contreras, culminating in Father filing a grievance against him, that Contreras sought to withdraw. Thus, as in *C.F.*, Contreras sought to withdraw shortly before trial based solely on Father's communications that he did not trust Contreras and did not consider Contreras to be effective. Moreover, just as the trial court in *C.F.* could

consider the "history and personalities" in the case, so too could the trial court here. The trial court had presided over this case for multiple years, conducted numerous hearings, and entertained a number of requests and motions filed by Father related to his representation by counsel. Under the specific facts of this case, we hold that there was good cause to allow Father's counsel to withdraw on the day of trial and the trial court did not abuse its discretion in doing so. *See id.* at 843–44; *see also* TEX. FAM. CODE § 107.016(2).

Additionally, although Father challenges the trial court's failure to appoint new counsel and not specifically the trial court's refusal to grant a continuance, we find the Fourteenth Court's analysis on that point to be instructive. There, the trial court allowed appointed counsel to withdraw the day before trial and then on the day of trial, denied the mother's motion for continuance and declined to appoint the mother new counsel, resulting in her representing herself at trial. As a basis for its denial of the continuance, the trial court stated that it had appointed counsel for the mother but she "chose to get rid of her," and the trial court refused to "delay this case so that [mother] . . . [could] get some advantage." *Id.* at 838. In its analysis of this issue, the Fourteenth Court noted that when the ground for a continuance is the withdrawal of counsel, the movant must demonstrate the failure to be represented at trial was not due to her own fault or negligence. *Id.* (citing *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex. 1986)). Because "[t]he only basis for withdrawal stated in

33

[appointed counsel's] motion [wa]s that Mother wanted a new lawyer," the court held that the mother did not carry her burden to show that her failure to be represented at trial was not due to her own fault or negligence, and thus, the trial court did not abuse its discretion in denying the motion for continuance. *Id.*

The same is true here. Father's failure to be represented at trial was due to his own actions. He went through three court-appointed counsel throughout the duration of these proceedings, each moving to withdraw based on Father's abusive conduct. As he stated in his own words at the trial—they quit because "they can't take an ass chewing." The last counsel finally moved to withdraw after Father informed him— four days before trial—that he filed a grievance against him. At that point, the trial had been reset several times to either allow Father to find new counsel after he claimed he wanted to hire his own or to allow Father's newly appointed counsel to get up to speed. Had the trial court appointed counsel for Father at this point in the proceedings, it would have undoubtedly delayed the trial even further.

In the analogous criminal context, a defendant may not use his right to counsel to manipulate the court or to delay his trial, *see Culverhouse v. State*, 755 S.W.2d 856, 861 (Tex. Crim. App. 1988), and a defendant "does not have the right to repeatedly alternate his position on the right to counsel and thereby delay trial." *Medley v. State*, 47 S.W.3d 17, 23 (Tex. App.—Amarillo 2000, pet. ref'd); *see Johnson v. State*, 257 S.W.3d 778, 781 (Tex. App.—Texarkana 2008, pet. ref'd)

34

("Constitutional protections connected with the right to counsel may not be so manipulated as to delay or obstruct the trial process."). So too should Father not be permitted to use his right to counsel in termination proceedings to manipulate and delay the trial. *See In re S.M.T.*, 2017 WL 3084300, at *14 (citing analogous criminal cases and holding trial court did not err in denying father's request for appointment of counsel and withdrawal of waiver of statutory right to counsel, made on third day of trial, where father failed to show that appointment of counsel would not cause delay or prejudice). Under these circumstances, we hold that the trial court did not err in refusing to appoint Father counsel after allowing his third appointed counsel to withdraw.

We overrule Father's eighth issue.

**Sufficiency of the Evidence**

In his remaining points on appeal, Father challenges the sufficiency of the evidence to support the trial court's termination findings.

**A.     Standard of Review**

A trial court may order termination of the parent-child relationship if DFPS proves, by clear and convincing evidence, one of the statutorily enumerated predicate findings for termination, and also proves that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (recognizing that federal due process clause and

Family Code both mandate "heightened" standard of review of clear and convincing evidence in parental-rights termination cases). DFPS must prove both elements—a statutorily prescribed predicate finding, and that termination is in the child's best interest—by clear and convincing evidence. *See In re E.N.C.*, 384 S.W.3d at 803. The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

To assess the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *In re J.F.C.*, 96 S.W.3d at 266. When "no reasonable factfinder could form a firm belief or conviction" that the matter on which DFPS bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id.* In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have resolved in

36

favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *See id.* at 109.

## B. Applicable Law

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In a case to terminate parental rights under Texas Family Code Section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that

will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *A.V.*, 113 S.W.3d at 362.

Here, the trial court terminated Father's rights under Family Code Section 161.001(b)(1)(D), (E), (F), (N), and (O). The Texas Supreme Court has held that because subsection (M) provides a basis to terminate parental rights due to a prior (D) or (E) finding, due process concerns, coupled with the requirement for a meaningful appeal, require that if an appellate court affirms a termination order based on a (D) or (E) finding, the court must provide the details of its analysis. *See In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019). Because Father challenges the trial court's findings under subsections (D) and (E) in his first and sixth issues, thus implicating due process concerns, we begin our sufficiency of the evidence analysis with these two subsections. *See id.*; *In re Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019).

**C.      Predicate Findings under Subsection 161.001(b)(1)(D) and (E)**

Family Code Section 161.001(b)(1)(D) provides that the trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to

38

remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Section 161.001(b)(1)(E) provides that the trial court may terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

This Court has previously held that "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under section D." *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). An analysis of endangerment under subsection (D) focuses on evidence of the child's physical environment, "although the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being." *Id.*; *see In re S.R.*, 452 S.W.3d at 360 ("'Environment' refers to the acceptability of living conditions, as well as a parent's conduct in the home."). Termination is permissible under subsection (D) if the Department proves that the parent's conduct caused a child to be placed or remain in an endangering environment, and, under subsection (D), termination may be based upon only a single act or omission. *Jordan*, 325 S.W.3d at 721.

Subsection (E) focuses on the parent's conduct and asks whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.).

"Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical well-being. *Id.*; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *In re S.R.*, 452 S.W.3d at 360. A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *Id.* Under subsection (E), courts may consider conduct both before and after the Department removed the child from the home. *See Avery v. State*, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ) (considering persistence of endangering conduct up to time of trial).

Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *In re S.R.*, 452 S.W.3d at 360. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a

40

"course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re J.S.*, 584 S.W.3d 622, 635 (Tex. App.—Houston [1st Dist.] 2019, no pet.). The Department does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *See M.C.*, 917 S.W.2d at 270. Under subsection (E), the evidence must show that the endangerment was the result of the parent's conduct, including acts, omissions, or a failure to act. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

"Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord S.R.*, 452 S.W.3d at 361. Violence does not have to be directed toward the child or result in a final conviction—"Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." *In re V.V.*, 349 S.W.3d 548, 556 (Tex. App.—

Houston [1st Dist.] 2010, pet. denied). Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ). For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child. *See id.* at 776–77. Evidence that a person has engaged in abusive and violent conduct in the past permits an inference that the person will continue to engage in violent behavior in the future. *Jordan*, 325 S.W.3d at 724. Courts may also consider evidence of a parent's abusive conduct toward others outside the home, including DFPS employees and staff, as evidence supporting an endangerment finding. *See Interest of M.M.M.*, No. 01-21-00269-CV, 2021 WL 5365102, at *10 (Tex. App.—Houston [1st Dist.] Nov. 18, 2021, pet. denied) (mem. op.) (considering mother's history of engaging in violent and abusive conduct toward others, both before and after child's birth, including hospital staff, Department staff, and service providers, as evidence supporting endangerment finding); *In re J.L.M.*, No. 01-16-00445-CV, 2016 WL 6754779, at *8 (Tex. App.—Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.) (considering evidence of mother's hostility toward Department employees during case as evidence supporting endangerment finding); *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *10 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.) (same).

There is evidence of Father's violent tendencies. Bosier testified that Father had called and left threatening recordings for Mother, which Mother shared with Bosier. Bosier testified that Mother was concerned about Father's violent streak, that she was afraid he would hurt her, and that she believed her children needed to be protected from Father. As further evidence of Father's violent behavior, the trial court heard testimony from Bosier that Father threatened her life. DFPS also introduced evidence of Father's previous 2016 conviction for domestic violence assault, to which he pled guilty and was sentenced to 150 days' imprisonment.

In addition to evidence of Father's violent behavior, DFPS introduced evidence of Father's criminal history. *In re S.M.*, 389 S.W.3d at 492 (evidence of criminal conduct, convictions, imprisonment, and their effects on parent's life and ability to parent, may also establish endangering course of conduct); *Walker*, 312 S.W.3d at 617 (routinely subjecting child to probability that he will be left alone because his parent is in jail endangers child's physical and emotional well-being). At the time of trial, Father was incarcerated on charges for driving while intoxicated and retaliation against Bosier. Both of these charges were filed against Father during the pendency of these proceedings. With respect to Father's DWI charge, Officer Stackhouse testified that Father was so intoxicated at the time he pulled him over—at noon—that he urinated on himself three times.

Additional evidence was introduced about Father's continued alcohol abuse, including medical records related to his diagnosis of cirrhosis of the liver due to alcohol abuse and admissions on medical intake forms dated during the pendency of the termination proceedings that he abused alcohol. *See J.O.A.*, 283 S.W.3d at 345 ("A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being."); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *S.R.*, 452 S.W.3d at 361–62. He also pleaded guilty to possession of marijuana and refused throughout the proceedings to submit to court-ordered drug tests. *See In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *6 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) (father's failure to participate in court-ordered drug test is equivalent to positive test result); *In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (stating that parent's "refusal to submit to [a] drug test may be treated by the trial court as if he had tested positive for drugs").

Considering the evidence in the light most favorable to the trial court's finding under Section 161.001(b)(1)(D) and (E), we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Father endangered his children's physical or mental well-being. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of a finding of

endangerment under Section 161.001(b)(1)(D) and (E) or was not so significant that the factfinder could not reasonably have formed a firm belief or conviction regarding endangerment. Accordingly, we hold that legally and factually sufficient evidence supports the trial court's findings under Section 161.001(b)(1)(D) and (E).

We overrule Father's first and sixth issues. Because sufficient evidence of only one predicate finding is necessary to support termination, we need not address Father's challenges to the trial court's findings under Section 161.001(b)(1)(F), (N), or (O). *See A.V.*, 113 S.W.3d at 362.

## D. Best Interest of the Child

In his seventh issue, Father contends there is legally and factually insufficient evidence to support the trial court's finding that termination of his parental rights was in the children's best interest.

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the

45

present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). These factors are not exhaustive, and evidence is not required on all of them to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Moreover, we note that evidence supporting termination under one of the grounds listed in Section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (holding same evidence may be probative of both Section 161.001 grounds and best interest).

DFPS "need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *C.H.*, 89 S.W.3d at 27). But the burden is on DFPS to rebut the presumption that the best interest of the child is served by keeping custody in the natural parents. *Vasquez v. Tex. Dep't of*

*Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.–Houston [1st Dist.] 2005, pet. denied).

### 1.    Children's Desires

Bosier testified that H.L.W. "has no intention or desire to see her father[.]" Coffey testified that H.L.W. has never mentioned wanting to go home with Father. S.K.W. likewise indicated to Dr. Mock that she did not want to go home with any of her family. And both children expressed a desire to be placed in foster care. This factor weighs in favor of termination of Father's parental rights.

### 2.    Children's Needs and Proposed Placement

As detailed above, when the children came into the care of the Department, they each had significant behavioral issues. However, since being placed in the respective facilities, each has made substantial improvements, were very happy, and have "blossomed." Further, each desired to be placed in a permanent foster home.

In contrast, Father had not demonstrated the ability to parent the children or provide for their basic needs. Father was incarcerated, did not have a consistent home, and did not have employment. Thus, there was no evidence that Father could provide the children with a stable home, that he had adequate parenting skills, or that he had the ability to provide minimally adequate care. *See In re C.A.J.*, 122 S.W.3d 888, 893–94 (Tex. App.—Fort Worth 2003, no pet.) (stating that courts may consider parent's poor judgment and inability to provide adequate care when

47

determining best interest and that "[w]ithout stability, income, or a home," parent was unable to provide for child's emotional and physical needs).

### 3.     Present and Future Emotional and Physical Danger to Children

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). Thus, the evidence discussed in support of the trial court's findings under Section 161.001(b)(1)(D) and (E) is probative as to potential danger in determining the children's best interest. *See Walker*, 312 S.W.3d at 619. The trial court heard testimony about Father's aggressive and threatening communications with DFPS caseworkers and staff during the pendency of this suit. Father's behavior during the pendency of this suit was so hostile that DFPS sought, and the trial court granted, a protective order for Bosier against Father due to Father's threatening behavior. The trial court also had before it evidence of Father's criminal history, which included the domestic violence assault conviction and the pending DWI and retaliation charges for which Father was incarcerated at the time of trial, and his continued alcohol dependency and abuse. The evidence of Father's continued endangering conduct supports the trial court's best interest finding. *See In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *16 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.) (mother's extensive history of violent abusive conduct directed at child, father, and other individuals, including Department

employees and law enforcement officers, supported best interest finding); *In re P.M.B.*, 2017 WL 6459554, at *13 (parent's aggressive and hostile behavior throughout case supported best interest finding); *see also In re M.S.L.*, No. 14-14-00382-CV, 2014 WL 5148157, at *7 (Tex. App.—Houston [14th Dist.] Oct. 14, 2014, no pet.) (mem. op.) (concluding father's series of crimes, including drug-related offenses and domestic violence, supported trial court's best interest finding); *In re J.I.T.P.*, 99 S.W.3d at 846 (domestic violence, even when child is not intended victim, supports finding that termination is in child's best interest); *In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (considering dismissed criminal charges relevant because mother was absent from child's life and unable to provide for child's physical and emotional needs each time she was jailed).

### 4. Stability, Compliance with Services, Programs Available to Assist

Evidence of a parent's unstable lifestyle can support a factfinder's conclusion that termination is in the child's best interest. *In re M.S.L.*, 2014 WL 5148157, at *8; *In re S.B.*, 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Lack of stability, including a stable home and employment, supports a finding that the parent is unable to provide for a child's emotional and physical needs. *See In re M.S.L.*, 2014 WL 5148157, at *8; *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

49

Although Bosier testified that at one point during the proceedings Father was cooperating and attempting to engage and complete services, that changed. The family service plan required Father to complete a domestic violence class, based on his history of domestic violence. However, at the time of trial, Bosier testified that Father had not completed the required class. Nor had he maintained a safe and stable home and environment, as required, due to the fact that he was incarcerated. She also testified that, even before being incarcerated, Father had moved around a lot and had refused to provide the Department with an address.

Bosier testified that Father was required to submit to random drug testing but, despite requests from Bosier, Father has adamantly refused to do so. Father further failed to complete individual and family therapy, parenting classes, and outpatient drug and alcohol treatment. Bosier testified that Father did not provide her with any information regarding employment or receipt of any services such as Medicaid or food stamps. Bosier stated that Father receives social security disability but does not have any other form of income that would allow him to support the children. These factors weigh in favor of termination.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Father's parental rights was in the children's best interest. *See In re J.F.C.*, 96 S.W.3d at266. Further, in view of the entire record, we conclude that the

50

disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Father's parental rights was in the children's best interest. *Id.*

We overrule Father's seventh issue.

## Conclusion

We affirm the trial court's order terminating Father's parental rights to H.L.W. and S.K.W.[3]

Amparo Guerra
Justice

Panel consists of Justices Kelly, Rivas-Molloy, and Guerra.

---

[3] During the pendency of this appeal, Father filed multiple pro se letters requesting various forms of relief from this Court. All pending motions and requests for relief are denied.